No. 23,106.

THE STATE OF KANSAS, ex rel. RICHARD J. HOPKINS, as Attorney-general, *Plaintiff*, v. WALTER E. WILSON, as Bank Commissioner for the State of Kansas, *Defendant.* ·

### SYLLABUS BY THE COURT.

1. QUO WARRANTO—*Ouster of Bank Commissioner—Mere Irregularities of Procedure Not Willful Misconduct.* Various irregularities of procedure on the part of the bank commissioner are held not to constitute willful misconduct.

2. SAME — *Impropriety of Public Official Passing Quasi-judicially on Matter in Which He Has Direct and Financial Interests.* Even in the absence of express legislative prohibition it is a grave impropriety and a breach of official obligation for a public officer to pass judgment in a quasi-judicial capacity upon an important matter in which he has a direct and substantial financial interest. It is held, however, that in the circumstances here presented, the action of the state bank commissioner in granting the application of a corporation of which he was a member for a permit to sell its stock was not influenced by the fact of such relation, was without actual corrupt motive, and did not of itself constitute such willful misconduct as to call for his removal from office.

3. SAME—*One Corporation Purchasing Stock in Another.* It is held to be unnecessary to decide whether one corporation has authority to purchase stock in another.

4. SAME—*Bank Commissioner May Not Examine Bank in Which He is Financially Interested.* The provision of the statute that no bank commissioner or his deputy shall examine any bank in which he is financially interested, in the light of the context and the history of the legislation, means that neither the commissioner nor a deputy shall personally examine a bank in which the individual making the examination is interested.

5. SAME—*Bank Making Loans in Excess of Statutory Maximum—Duty of Bank Commissioner.* The provision of the statute that where a bank has made loans in excess of the statutory maximum the commissioner may order them reduced to the legal limit within sixty days, does not impose upon him the absolute duty of seeing that such reduction is made within that time, but intrusts him with a considerable discretion in handling the matter.

6. SAME—*Requiring Defaulting Banker to Pay Expenses and Lawyer's Fees in Effort·to Save Bank from Wreckage not Improper.* Where the defaulting officer of a bank is trying to raise money to save it from being wrecked as a consequence of his misconduct, and the bank com-

missioner is coöperating with him in an effort to that end, there is no impropriety in the commissioner requiring him to pay the expenses incident thereto, including a fee for the services of a lawyer.

7. SAME—*The Word "Willfully" as Used in Statute Interpreted.* In the statute authorizing the removal of an officer who willfully misconducts himself in office, or willfully neglects to perform any official duty enjoined upon him by statute, the word "willfully" is to be interpreted as implying a wrongful motive.

8. SAME—*Discretionary Power of Bank Commissioner in Case of Insolvency or Unlawful Conduct of Bank Officials.* The statute making it the duty of the bank commissioner to take charge of a bank immediately upon a showing of insolvency or of a willful violation of the banking act by its officers, does not require the closing of the bank under such circumstances, nor does it deprive the commissioner of his discretionary power to take such steps to meet a particular situation as may be called for by the circumstances.

9. SAME—*Neither Willful Misconduct Nor Corrupt Motive Established by the Evidence.* It is held that the evidence does not establish any corrupt motive on the part of the bank commissioner, or that he knew the bank to be insolvent at the time of acts complained of, or that he was guilty of misconduct in failing to take possession of the bank at other times than he did, because of the violation of the law by its officers.

10. SAME. The evidence is held not to establish willful misconduct of the defendant in relation to the issuance of certificates of deposit by the Salina bank for less than their face, or for money borrowed; or in relation to the issuance of such certificates without consideration; or in relation to the issuance and acceptance of drafts having no deposit or security back of them, or the allowance of overdrafts; or in relation to the acceptance of deposits.

11. SAME — *Bank Commissioner to Give Notice to County Attorney of Criminal Violation of Banking Act.* The statute which requires the bank commissioner to notify the county attorney of a criminal violation of the banking act by a bank officer is substantially complied with by giving information thereof to the attorney-general's office.

Original proceeding in quo warranto. Opinion filed March 26, 1921. Judgment for the defendant.

*Richard J. Hopkins,* attorney-general, *John G. Egan,* assistant attorney-general, *C. A. Matson,* of Wichita, and *F. M. Harris,* of Ottawa, for the plaintiff.

*Bennett R. Wheeler, S. M. Brewster,* and *John L. Hunt,* all of Topeka, for the defendant.

The opinion of the court was delivered by

MASON, J.: On July 10, 1920, this action was brought in this court by the state on the relation of the attorney-general against Walter E. Wilson, bank commissioner, to oust him from that office, under the statute authorizing the removal by such method of an officer "who shall willfully misconduct himself in office, or who shall willfully neglect to perform any duty enjoined upon such officer by any of the laws of the state of Kansas." (Gen. Stat. 1915, § 7603.) Issues were joined by the defendant's denial of the charges against him, and Honorable James M. Challis was appointed as commissioner to take the evidence and make findings of fact and conclusions of law thereon. On February 12 the commissioner reported, recommending a judgment in favor of the defendant. The case is now submitted for final determination, upon the evidence and the report of the commissioner.

1. The state charged the defendant with willful misconduct in office and willful neglect to perform duties enjoined upon him by statute, the general charge being supported by sixteen counts or specifications. The first specification, in the order of their statement in the petition, alleged that the defendant as a member of the state charter board voted in favor of the granting of a charter to a company—the Kansas Bank Holding Corporation—in which he was financially interested, his vote being necessary to such an order. The commissioner found that the defendant was not a stockholder in the corporation at the time the charter was granted although he had been solicited to take stock therein and did so immediately thereafter; and this appears to be in accordance with the facts. There is no occasion, however, to discuss this particular transaction further because a matter of essentially the same character is involved in the next specification.

The second specification charges that the defendant as a member of the charter board (composed of the attorney-general, secretary of state and bank commissioner) voted in favor of granting to the corporation referred to a permit to sell its stock—such a permit being required by the "blue-sky" law (Gen. Stat. 1915, ch. 106; Laws 1919, ch. 153); and that this action was wrongful for three reasons: (1) because the char-

ter showed that all the stock of the corporation had been subscribed for and the defendant therefore knew that it had none for sale; (2) because a number of statements required by law were not filed with the bank commissioner before the permit was granted, the defendant failed to make an examination and audit of the corporation's affairs and appraisement of its property, as the statute requires, and the application for the permit was not sworn to; and (3) because the defendant was at the time a stockholder and officer of the company.

The charter in setting out the names of the stockholders, and the number of shares held by each, indicated that all the stock had been issued—5,000 shares. The application for leave to sell stock showed the issuance of but 130 shares. Whatever may have been the occasion of the discrepancy the recital of the charter was manifestly erroneous and nothing more serious than an oversight can be charged to the defendant in this connection. The statements the omission to file which is complained of were: copies of the stock to be sold, of the corporation's charter, and of any prospectus or advertising matter to be used; statements of the gross and net earnings of the corporation, actual or estimated, and the plan upon which its business was to be conducted. As the provisions of the charter were of record and the corporation was asking leave to sell its own stock the omission to file copies thereof before action was taken by the board was not vital. It does not appear that any prospectus or advertising matter had been at that time determined upon. As the corporation had not begun business the requirement as to a statement of its earnings was not applicable. The application contained a statement of the plan of selling stock, namely, either for cash or for one-third cash and the balance in six months. Later statements were attached, to the effect that stock was to be sold for $250 a share—$100 to capital, $100 to surplus and $50 to organization expenses—and that the corporation expected "to invest in country or city banks stocks, and if they wish engage in a general investment business." The statute appears to leave it to the bank commissioner to determine whether it is advisable to make a detailed examination and audit of the affairs of the maker of the securities to be sold, including an appraisement of the property (Gen. Stat. 1915, § 9461, as

amended by Laws 1919, ch. 153, § 3), and in view of the fact that the corporation had just been chartered there was little occasion for further information than was furnished. The printed form used in making the application contained an affidavit of the truth of the statements therein made, which was signed by the president and secretary of the corporation, but no jurat was attached. We do not regard the omission as important here.

2. Whatever room there may be for difference of opinion as to the kind of misconduct that will justify a removal under the statute referred to, we do not regard the matters already passed upon as approaching near enough to the dividing line between mere irregularity and the intentional disregard of duty to occasion serious doubt or to warrant further discussion. But the portion of the second specification which remains to be considered stands upon a very different footing. The statement made to the charter board as a basis for the issuance of a permit for the sale of stock of the corporation designated the defendant as its treasurer and showed him to be the owner of 20 shares of its stock, representing an investment of $5,000. The attorney-general was absent from the state when the application for the permit to sell stock was presented and considered and no order for its issuance could have been made except by the affirmative approval of the bank commissioner—the officer especially charged with the duty of examining the showing in its support and of making further necessary inquiries. One of the matters necessary to be determined in connection with the granting of the permit was the maximum amount that might be paid for promotion—for all expenses connected with the sale of the stock, and as already indicated this was fixed at 20 per cent. For the defendant in these circumstances to cause the granting of the permit was obviously a grave impropriety; it involved his passing judgment in a quasi-judicial capacity upon an important matter in which he had a direct and substantial financial interest. Such action has not in terms been forbidden by the legislature, but the public policy which underlies a number of statutes in which it is given distinct expression not only prohibits an officer from being influenced in his public acts by the consideration of personal profit to himself, but as well condemns his

being so placed as to be exposed to the possible temptation of such influence—forbids "any one acting in a fiduciary relation, to tempt his own loyalty by entering into a transaction which requires him to play a dual role." (*The State v. Dean*, 103 Kan. 814, 176 Pac. 633.) We see no reason to believe, however, that the defendant's approval of the corporation's application for a permit to sell stock was in any degree due to his being a stockholder and officer—that his course was at all different from what it would have been if he had had no personal interest in the matter. Inasmuch as no express statute was violated and we find that there was no actual corrupt motive we conclude that the breach of official obligation in this respect did not of itself constitute such willful misconduct as to call for his removal from office.

3. The third specification alleges that the purpose of the Bank Holding Corporation was to own and control many banks in Kansas, and that in order to assist in the sale of its stock the defendant represented to a prospective buyer that the power of his office as bank commissioner would be used to assist the corporation by giving it the benefit of information obtained by him in his official capacity. The only evidence on the subject showed explicitly that no such representations had been made, thus disposing of this feature of the matter.

The plaintiff contends in its brief that the business proposed to be done by the Bank Holding Company was illegal in that it involved the purchase by one corporation of stock in another, a transaction not authorized by the statute. This contention is probably made under the allegation regarding the purpose of the company which has just been stated, since there appears to be no more specific reference to it in the petition. We regard it as unnecessary to determine the soundness of the contention. The charter of the company described the purpose for which it was formed as "to transact a general investment company business." If the corporation from a grant in these words obtained no power to buy bank stock it could not derive the right to do so from a permit to sell its own stock. The theory that an investment company may purchase and hold stock in banking corporations is sufficiently plausible so that the issuance of a permit to one to sell its own stock, with knowl-

edge that it intends to invest its capital in bank stock, cannot be regarded as willful misconduct.

4. The fourth specification alleges that the defendant acquired stock in several banks which had been chartered during his term of office and which would not have obtained charters except by his vote; that in acquiring this stock he used the knowledge he had obtained as bank commissioner and his influence as such officer; that after he acquired the stock the banks were examined by himself or his deputies. We do not regard the mere fact that the defendant afterwards bought stock in banks which had been chartered by virtue of his vote as constituting of itself willful misconduct, and we discover no evidence of any special circumstances affecting the matter, such as the wrongful use of his official power. In the plaintiff's brief it is said that the defendant as between two conflicting applications for a charter favored that of a corporation in which he was already interested, but no citation is given to places in the abstract or record in which such evidence is to be found, and we have failed to discover it. The commissioner's report makes no mention of it. In any event this accusation is not made in the petition.

The banks in which the defendant owned stock were examined by his deputies. The statute provides that "no bank commissioner nor his deputy shall examine any bank in which he is a stockholder or in any way financially interested." (Gen. Stat. 1915, § 538.) This means that neither the commissioner nor a deputy shall personally examine a bank in which he (the individual making the examination) owns stock. A bank in which the commissioner is financially interested must be examined by a deputy. A bank in which a deputy is a stockholder must be examined by the commissioner in person or by some other deputy. That this is the true interpretation is clear from the context and the history of the legislation. Originally no one who was financially interested in a bank was eligible for the office of commissioner or deputy. (Gen. Stat. 1901, § 427.) This clause was stricken out and in lieu of it one was inserted to the effect that the commissioner or deputy unless he had served a term as commissioner must have had at least three years' practical knowledge of banking; and to this new provision was added that above quoted. Obviously the legislature

intended to remove the bar against the commissioner or deputy holding stock in a bank, and as all banks must be examined by a commissioner or deputy (Gen. Stat. 1915, § 542; Laws 1908, ch. 13, § 1) no other construction of the statute is open than the one indicated.

5. The fifth specification alleges that during his whole term of office the defendant has been a stockholder in a state bank, which has been examined by himself or by his deputies; that this bank made loans in excess of the statutory limit, and the defendant with knowledge of the fact failed to require it to conform to the law on the subject. The matter of the examination of the bank by deputies is covered by what has already been said. The accusation respecting the course of the department with reference to excess loans calls for an interpretation of the statute which reads:

"The total liability to any bank of any person or company, corporation or firm, for money borrowed, including in the liabilities of a company or firm the liabilities of the several members thereof, shall not at any time exceed fifteen per cent of the capital stock and surplus of such bank actually paid in; but the discount of bills of exchange drawn in good faith against actual existing values or loans upon produce in transit, or upon warehouse or elevator receipts as collateral security, and the discount of commercial or business paper actually owned by the person negotiating the same, shall not be considered as money borrowed. The bank commissioner may, at any time, order any excess loan reduced to the legal limit within sixty days from the date of notification by him." (Gen. Stat. 1915, § 530.)

It was shown that the bank referred to (as well as other banks) had exceeded the prescribed limit and that although the commissioner upon this fact being reported had in each instance directed a reduction the excess continued. The plaintiff regards the word "may" in the last sentence of the section quoted as having the force of "shall," and interprets the statute as placing upon the commissioner the absolute duty of seeing to it that the loans are brought down to the statutory maximum within sixty days from his notification, a default in that respect amounting to a direct and voluntary violation of an express statute and therefore constituting willful misconduct. Commissioner Challis found that the excess loans in this and other banks were brought about by abnormal conditions following the war and the readjustment period. The fact that the statute

after explicitly forbidding the loan limit to be exceeded provides that the bank commissioner may order an excess to be reduced within sixty days seems clearly to imply some elasticity in the enforcement of the rule. Granting that the commissioner possesses full power to compel a reduction within sixty days under penalty of closing the bank, conditions might exist in which that course would bring about disastrous consequences. We think it is the purpose of the statute to intrust the commissioner with a broad discretion in handling such matters, and that it cannot be said that in the present case such an abuse of discretion has been shown as to amount to a willful neglect of duty.

6. The sixth specification alleges that the defendant extorted $500 from an officer of the Linn County State Bank by requiring him to pay that amount to a designated lawyer, and attempted to extort a further sum in the same manner. The accusation grows out of these facts: The bank officer confessed to having forged names of his customers to notes for some $30,000. While he was in the defendant's office the defendant called in the lawyer, who was not an official, and arranged for him to take charge of the matter, appointing him as a special deputy, with directions to take charge of the bank if a run started, and telling the bank officer he would have to pay for the lawyer's services with the other expenses. The bank officer made no objection and did pay the lawyer $500. A brother of the banker came from Oregon, put $140,000 in the bank, taking out the fraudulent and slow paper. The lawyer watched the matter for some ten days, drawing necessary papers for the adjustment. No run was started. The lawyer suggested to the banker's brother that he should receive a further payment but none was made. We discover nothing in any phase of the transaction that is not wholly creditable to the commissioner and the lawyer. It was entirely proper that the defaulting officer should bear the expense of the successful efforts to prevent the bank being wrecked as the result of his dishonesty. There is no room for even a suspicion that he was induced to put up the money in the hope of obtaining immunity from prosecution.

7. The remainder of the sixteen specifications relate to the conduct of the defendant with reference to the Traders State

Bank, afterwards known as the Kansas State Bank, of Salina. The seventh specification alleges that from and after June 9, 1917, the bank was in an insolvent condition, due to its funds having been misapplied and misappropriated by its officers; that with knowledge of this the defendant did not take possession of the bank but allowed it to do business for approximately two years, under the control of officers who continued to misapply its funds and violate the banking law. The banking act contains a section reading in part as follows:

"If, upon examination by the state bank commissioner or his deputy, or from any report made to the bank commissioner, it shall appear that any bank is insolvent, or has willfully violated any requirement of the act to which this is amendatory, it shall be the duty of the bank commissioner to immediately take charge of such bank and all property and effects thereof. . . . Upon taking charge of any bank, the bank commissioner shall, as soon as possible, ascertain by a thorough examination into its affairs, its actual condition; and whenever he shall become satisfied that such bank cannot resume business or liquidate its indebtedness to the satisfaction of all its creditors, he shall forthwith appoint a receiver . . ." (Gen. Stat. 1915, § 547.)

Reports of examiners on and prior to November 27, 1917, showed that the bank was carrying a grossly excessive amount of obligations of Felix Broeker, a director, and on that date the defendant placed a representative in the bank who took full charge, overseeing all loans and discounts. He and a successor remained in the bank representing the banking department until in April, 1918, when a syndicate was formed of persons interested in Broeker's credit, by means of which some $125,000 of the Broeker paper was taken out of the bank. A reorganization was effected, the president and Broeker resigning. In November, 1918, H. J. Lefferdink bought into the bank, becoming its cashier and active managing officer. In December, 1918, Lefferdink used cash and credit of the bank on the purchase of a ranch in New Mexico and as a result of this an examiner took charge of the bank about December 30, 1918, his possession continuing until a receiver was appointed on May 26, 1919. In January and February, Lefferdink was guilty of various violations of the banking law.

Before entering upon a discussion of the merits of the controversy respecting the defendant's conduct in relation to the Salina bank it may be well to consider the effect of the statutes

involved. The plaintiff and defendant disagree as to the force of the word "willfully" in the act upon which the proceeding is based. The plaintiff cites authorities tending to show that it means no more than intentionally, while the defendant cites others supporting the view that it implies moral turpitude. It is unnecessary to consider what construction may be placed upon the word in other connections. "In quo warranto, where forfeiture of a public office is demanded by the state on charges of willful misconduct in office or willful neglect of official duty, the paramount consideration in scrutinizing the acts of the defendant officer is whether they bear the distinguishing characteristics of genuine good faith, not whether those acts are technically free from error when viewed under rigid and critical scrutiny." (*The State, ex rel., v. Foley,* 107 Kan. 608, 193 Pac. 361.) The statute is not designed for the removal of an officer merely for the improvement of the public service, because he has been inefficient and has acted with bad judgment. It is essentially penal in its nature and is to be construed accordingly. The word "willful" "is sometimes held to be equivalent to 'intentional' or 'designed', and not to require a wrongful intention or malice, but generally, when employed in a penal statute, it indicates a bad or a corrupt purpose, an evil intent without reasonable grounds to believe the action is lawful." (16 C. J. 80.) Where it is applied not to a specific act but to a general term as "misconduct" there seems the greater reason for following the usual rule. Not every departure from the letter of the law will warrant a judgment of ouster. Especially as to matters intrusted to the control of an officer in which he is at liberty to exercise some degree of discretion an actual wrongful motive is rightly regarded as necessary to that end.

8. The statute last quoted makes it the duty of the bank commissioner to take charge of a bank immediately upon a showing of insolvency or of a willful violation of the banking act. This does not require the closing of the bank under such circumstances nor do we regard it as depriving the commissioner of his discretionary authority to take such steps to meet a particular situation as the circumstances may require. For illustration, in the case of the Linn County State Bank, already referred to, the defaulting officer had clearly violated the requirements of the banking statute and the bank was doubtless there-

by rendered insolvent. Instead of at once closing the bank, however, the defendant merely exercised a careful supervision over it and within a short time sufficient funds were procured to put it upon a sound footing. It has not been suggested that his course in this regard amounted to misconduct, and we do not think it open to that characterization.

9. The findings of Commissioner Challis with respect to the specifications now under consideration read as follow:

"At the time of the appointment of the defendant as bank commissioner he was advised by his predecessor in office of twenty or twenty-five state banks which needed special attention from the banking department. Among this number was the Traders State Bank, name afterwards changed to the Salina State Bank, of Salina, Kan. One C. B. Kirtland was the president of this bank and held one hundred seven (107) shares of its stock, and one Felix Broeker was a director in said bank and held fifty (50) shares of its stock. This bank had been examined on February 6, 1917, before the defendant took office, and the examination disclosed that the bank then held so-called 'Broeker paper' to the amount of one hundred seventeen thousand six hundred sixty-three ($117,663.66) dollars and sixty-six cents. Felix Broeker was a Salina boomer and promoter of rare sagacity and audacity. He was then and had theretofore been engaged in floating various projects, including the Globe Life Insurance Company, for which he had sold a quarter of a million dollars worth of its stock, and was engaged in selling a second quarter of a million. He was also connected with the National Bonding Company, which had sold over three hundred fifty thousand ($350,000) dollars of its stock. The stocks in these companies were divided into shares, par value ten dollars each, and sold for fifteen dollars or twenty-five dollars per share. Broeker was also interested in a drug concern, and was also interested in the Okla-Queen Oil Company, the shares of which had a par value of one dollar, and were readily sold by Broeker and his assistants at two dollars per share. The stock in these various enterprises was sold for cash or notes, and when notes were taken they were discounted in aggregates of several hundreds of. thousands of dollars in the banks of northern Kansas, including the Kansas State Bank. During the year of 1917, Kirtland, Broeker and their associates, were men of standing in the community and their integrity unquestioned. At the examination of the Salina State Bank, February 6, 1917, there was found therein notes which had been taken for stock in the various Broeker enterprises and discounted to the bank. Fifteen thousand seven hundred forty-eight ($15,748.45) dollars and forty-five cents of this paper was indorsed personally by Broeker, and a small part of the balance was indorsed by the Globe Life Insurance Company and the National Bonding and Casualty Company. The bonding company had on deposit in the bank an open account of seventy thousand ($70,000) dollars. Requirements were made by the then bank examiner, on the usual form, that excess loans amounting to twenty-five thousand one hundred five ($25,-

The State, *ex rel.*, v. Wilson.

105.14) dollars and fourteen cents should be reduced within sixty days, and that the Globe Life Insurance Company and the National Bonding and Casualty Company, which included loans to stockholders, companies or corporations in which stockholders were interested, should be reduced within sixty days. The condition of the bank was indicated by the examiner as being fair.

"The next examination of the bank under the jurisdiction of the defendant was on June 9, 1917, which also showed, in the opinion of the examiner, the condition of the bank to be fair. The so-called Broeker paper had been reduced from $117,663.66 to sixty-six thousand seven hundred and forty-three ($66,743.25) dollars and twenty-five cents, the difference in the two items indicating notes which had been paid.

"The next examination of the Salina State Bank by the defendant was on August 27, 1917, which showed the condition still fair. The bonding company had increased its checking account to ninety-three thousand six hundred one ($93,601.78) dollars and seventy-eight cents.

"On September 5, 1917, the defendant wrote to Kirtland, president, to the effect that new paper in the bank given in the name of various individuals was in fact loaned Broeker; that this would not be permitted, and Kirtland was directed to charge such loans off the books. This communication was answered by one of full explanation, and indicated that some of the notes criticized were not Broeker notes and were given by very desirable patrons.

"On October 16 the defendant directed his deputy, W. C. Muth, to keep his eye on the Salina bank, Muth being a resident of Salina. On October 22, 1917, Muth wrote the defendant that the Broeker paper had been increased to two hundred eighty-four thousand ($284,000) dollars.

"On October 26, 1917, the defendant advised Kirtland of the situation and demanded that he cease the making of promotion loans and clean up the bank; if he did not do so he would put a representative of the department in charge. On October 30, Kirtland wrote the defendant, assuring him that he had taken the last note from Mr. Broeker as an increase to their loans, that he had advised Broeker to that effect, and that Broeker could not increase his line of loans with the bank and that loans already made would be taken out as soon as possible.

"On November 27, 1917, Examiner Muth advised the defendant that Kirtland, the president, had permitted Broeker to borrow more money to enable Broeker to operate in South Dakota, presumably selling stock.

"On November 29, 1917, the defendant put his special representative, Mr. Bradlee, in the bank at Salina. Bradlee reported that Muth, the examiner, who had theretofore examined the bank, was of the opinion that with a capable man in charge of the bank the loans could all be cleared up and a satisfactory business done, and that Muth desired to purchase an interest in the bank. Up to the time Bradlee went in charge, and for some time after, the Broeker paper was not allowed to become overdue. Broeker had for some weeks been reducing the amount of it at the rate of $25,000 per week. Many of the so-called notes were secured by the personal indorsement of Broeker, the Globe Life Insurance Company, the National Bonding and Casualty Company, and by deposit of

shares of stock in the Okla-Queen Oil Company. The criticism of the defendant at this time on the Broeker paper was not that the paper was not good, but that the principal makers of the notes lived in territory outside of the local banking domain of the Salina bank, and of necessity were unknown to the officers of the bank. Previous to the time that Bradlee went into the bank Broeker had deeded to Kirtland, as trustee of the bank, without any defeasance, some property that belonged to Broeker in Salina, as additional security for notes Broeker had sold the bank. The defendant required Kirtland or Broeker to have this property deeded to himself as trustee for the better protection of the bank. The evidence shows that Kirtland was the weak and pliable tool or victim of the domineering and magnetic Broeker, and did not have the stamina to refuse to accept from Broeker notes that were tendered for discount. Broeker also deeded to the defendant, as trustee, for the benefit of the bank, certain property owned by him in Texas, and 125,000 shares of oil stock, which was then current on the market at two ($2) dollars per share, and in addition to that Broeker turned over $140,000 to $150,000 of life insurance policies which had no legal reserve value. These transactions were had with the advice and assistance of Assistant Attorney-general Hawkes, who drew the necessary papers. At the same time the defendant had a financial statement, signed by Broeker, showing net worth of $671,133.50, and after consideration of the statement and investigation, the defendant deemed Broeker to be worth $300,000. The bank at this time had a majority of the Okla-Queen stock as collateral.

"In February, 1918, a shortage of $106,000 was discovered in the assets of the Globe Life Insurance Company, which shortage was made the basis of a criminal charge against Broeker. It was suggested to the defendant by Mr. Bradlee who was in charge of the bank that Broeker's friends should come to his rescue and straighten out his financial difficulties. After considerable negotiation with the attorney-general's office, Broeker's attorneys and Broeker and the defendant, it resulted in the friends of Broeker coming to his rescue to save the life insurance company, the bonding company and the bank, and their subscriptions to that end totaled about $250,000. The defendant acted as trustee of the syndicate and the contributions were paid to him. There was $80,000 paid in the form of certificates of deposit, which were delivered to the insurance commissioner for the shortage in the Globe Life Insurance Company; something like $90,000 was contributed in what was considered good notes. These notes went into the Salina bank. The syndicate incorporated into a trust company and these notes were indorsed by the trust company. The balance of $106,000 to the Globe and $125,000 to the bank was secured by joint mortgages upon the Broeker real estate, which had theretofore been deeded to the defendant as trustee. In consideration of the $90,000 in notes and the balance raised on joint mortgage, there was taken out of the bank and delivered to the trust company $125,000 of the so-called Broeker paper, which had been selected by Bradlee as being the least desirable paper in the bank. The makers of the $90,000 notes were investigated by defendant and by him deemed to be good. The difference

between the total subscriptions and $175,000 which was accepted was to remain as additional security, protecting the other notes in the bank which had not been taken out. The indorsement of the trust company was backed by the character of the men which composed it, who were deemed by the defendant substantial and first-class citizens, and by the Salina and Texas real estate. Whatever Okla-Queen stock was deposited in the bank as collateral for individual notes was surrendered to the syndicate if notes thus secured were in the list designated by Bradlee.

"By this time the bank was reorganized. A Mr. Gates, a gentleman of high standing, was president, and Judge Supple vice-president. Fred Dryling, late county treasurer of Ellis county, was made active vice-president and Sydney Walker assistant cashier. In the judgment of the defendant, the reorganization of the bank and the elimination of $125,000 past-due Broeker paper, and the new management coming in and taking charge of the bank, the prospects for the bank were very bright. The drains on the bank that summer were extensive, but all demands were promptly taken care of at the proper time. The examiners who were designated by the defendant to examine the Salina bank were not advised as to what collateral was held and as to what efforts the defendant was making to clean up the bank. They took the bank as they found it and had no opportunity to learn what efforts the defendant might be making to require the officers of the bank to clean the same up financially. As a result of this syndicate and trust company, the Globe Life Insurance Company received $106,000 in certificates of deposit, and the mortgage, which was sold for fifteen or eighteen thousand dollars. The commissioner of insurance had a receiver appointed for the Globe, and it was reorganized and taken over by the Pioneer Life Insurance Company of Kansas City, and subsequently consolidated with another company. The National Bonding and Casualty Company, after attempting to consolidate with other companies, liquidated, paid its obligations and distributed among its stockholders $10.37½ per share. The deposit of the bonding company in the bank was arranged by the defendant so that it took so much of the assets as were represented by certificates of deposit in time certificates running one year. The $70,000 checking account was paid out of the bank in three installments of thirty, sixty and ninety days.

"The defendant shortly after June 9, 1917, did not know, and the evidence does not disclose, that the Salina State Bank was insolvent, but the defendant did know that the officers of said bank were indebted thereto in large sums, but the officers who were in charge on June 9, 1917, being Kirtland and Broeker, the president and director, subsequently ceased their connection with the said bank as officers and were supplanted by others. The evidence does not show violation of the banking laws of the state of Kansas by Kirtland and Broeker other than the allowing and receiving loans in an amount in excess of the legal limit, and such excess loans were handled through the defendant's department, as in all other cases, with the requirement that the same be reduced, which requirement

was complied with, and yet, without the knowledge of the defendant, the rule against excess loans was again violated by the president of said bank."

The commissioner also found as follows with respect to the subsequent history of the bank:

"In the month of November, 1918, the management of the Salina State Bank changed hands. One H. J. Lefferdink acquired control of the bank through the ownership of two hundred eighty-eight shares of its stock. For audacity, reckless daring and frenzied financial operations he was the peer of his master, Broeker; more cannot be said. Lefferdink acquired Dryling's interest and succeeded him as cashier. Upon assuming the position of cashier, or shortly thereafter, Lefferdink gave bond in the sum of $25,000. Lefferdink had been a banker theretofore in the state of Nebraska, and carried letters of recommendation, including one from the bank commissioner of that state. He also submitted his sworn financial statement November 14, 1918, showing his net worth to be approximately $154,250. At the time Lefferdink acquired his interest in the bank and became cashier thereof the defendant did not know, as subsequently developed, that Lefferdink was in any way connected with Broeker or Broeker's institutions.

"During the month of December, 1918, Lefferdink, Broeker, W. C. McClintock, H. D. Mollohan and Keller, who subsequently transferred his interest to Myers, became interested in the purchase of a very large cattle ranch in New Mexico. The ranch was divided into five interests of $25,000 each, one of which interests was taken over by Lefferdink and Broeker, one interest by Shore, one by Keller, one by McClintock and one by Mollohan. A corporation was formed called the Land, Cattle and Development Company, which took title to this ranch and executed a mortgage thereon to Shore and Hill, the former owners. There was a large herd of cattle on the ranch, upon which a chattel mortgage had been executed, and which chattel mortgage was subsequently foreclosed. The defendant requested F. J. Harper, deputy bank commissioner, and L. A. Johnson, assistant bank commissioner, to make an examination of the Salina bank as of date December 28. This examination disclosed that just prior thereto Lefferdink had borrowed $75,000 from the bank— $25,000 in cash, and had issued two certificates of deposit for $25,000 each —prior to December 28; and subsequently, between December 28, the date as to which the bank was examined, and the time when the examination was actually made, he issued two additional certificates of deposit for $25,000 each—making a total of $125,000, for which he gave the bank his note due in ten days. These certificates went into the hands of the parties interested in the New Mexico land deal and were used for the purpose of acquiring that property. The defendant Wilson had absolutely no knowledge or intimation of the issuance of the certificates of deposit or the issuance of the draft for $25,000 until after they were accomplished facts, and did not know of the purpose of Lefferdink and Broeker of financing the deal through the funds of the Kansas State Bank. Immediately upon

the discovery of the issuance of the certificates of deposit and draft, Johnson, the assistant bank commissioner, demanded and received from Broeker assignments for the Bankers Cattle, Land and Development Company of whatever rights they had in the New Mexico property, and Lefferdink executed a mortgage upon the farm he had in the state of Nebraska. These were not taken in ratification of the loan which Lefferdink had made to himself, but were simply taken as security or indemnity for the situation as it existed. The New Mexico ranch consisted of 183,000 acres of deeded land, and a like amount of leased land carrying a merely nominal rental, with a right to purchase it within a period of thirty or forty years upon small payments, highly improved, with ranch buildings of a permanent character. It had been appraised by Lock Davidson, of the Guaranty Title and Trust Company of Wichita, at $1,200,000, and was deemed to be capable of carrying a bond issue of $500,000. It was the purpose and object of the promoters of the ranch deal to finance the proposition in the East, and negotiations had apparently proceeded so far that Lefferdink was confident that the money would be forthcoming from New York within the ten days covered by his note. The certificates of deposit which were issued for this ranch were never recognized by the defendant as an obligation of the bank, and the one held by McClintock never was, and assurances have frequently been made that it never will be presented for payment. Lefferdink was president and treasurer of the Bankers Land, Cattle and Development Company, and made representation to the defendant and his deputies that funds would be forthcoming daily as the result of the sale of the ranch bonds. Broeker was interested with Lefferdink in this transaction, and in view of the marked success Broeker had theretofore had in disposing of stock in his various enterprises the defendant was justified in placing reliance upon the statements, hopes and expectations of the promoters of this ranch. The ranch enterprise was, upon its face, a legitimate deal. There was intrinsic value present sufficient to take care of all liens on the property and make a return more than sufficient to reimburse the bank for the Lefferdink loan. Sound business judgment demanded, under the existing circumstances, that Lefferdink should be permitted to complete negotiations he had started for the placing of the bond issue on the ranch, to the end that the $25,000 of cash he had actually taken out of the bank should be returned and the bank protected against possible liability on such of the certificates of deposit as would be presented against it. Reports were constantly received from time to time from Lefferdink, Broeker and McClintock that the bonds on the ranch would be taken by a house in New York for $500,000. McClintock had theretofore been the attorney for the defendant in several matters. His dealings with the defendant had always been honorable, and the defendant had implicit confidence in him.

.   .   .   .   .   .   .   .   .   .   .   .   .

"While H. J. Lefferdink was the cashier of the Kansas State Bank he caused certain drafts and bills of exchange to be drawn upon banks in

various cities and credited to accounts of himself and Broeker on the books of the Kansas State Bank. These drafts were credited· upon the books of the Kansas City, Mo., banks through which they were presented, but when presented for collection upon the banks on which they were drawn payment was refused and said drafts and bills of exchange were returned to Kansas City and the amounts were deducted from the funds to the credit of the Kansas State Bank in said Kansas City, Mo., banks, and said protested drafts and bills of exchange were returned to the Kansas State Bank at Salina, Kan., where they came into the possession of Lefferdink, the cashier of said bank, and were by him secreted or destroyed. Lefferdink failed to charge such protested drafts and bills of exchange to the account of himself and Broeker upon the books of the Salina bank, and no entries were made on the books of the bank showing that the total amount of said drafts and bills of exchange had been charged against and deducted from the funds of the Kansas State Bank in the banks in Kansas City, Mo., and the books of the Salina bank continued to show that the total amount of said drafts and bills of exchange was still to the credit of the Kansas State Bank in said banks in Kansas City, Mo., and continued to show the amounts of said protested drafts as credits to the accounts of Lefferdink and Broeker. These transactions took place during the months of January and February, 1919. On or about December 30, 1918, the defendant placed in active charge of the Kansas State Bank, at Salina, one F. J. Harper, deputy bank commissioner of the state of Kansas, who remained in charge of said bank under the direction of the defendant until the appointment of a receiver for said bank on the 26th day of May, 1919. The said F. J. Harper, so in charge of said bank, and during the month of February, 1919, learned of the issuance, negotiation, protest and return of such drafts, and advised the defendant thereof. That acting under the direction of the defendant, the said F. J. Harper did not correct the books of said bank so that they would show the true condition thereof, which correction was not made at the request of the defendant, for that experience had taught the defendant that the changing of bank records by third parties would seriously interfere with the successful prosecution of any one who was charged with an offense, the proof of which depended upon the bank records. That during the month of March, 1919, the defendant, as bank commissioner, issued a call as to the then condition of the state banks, including the condition of the Kansas State Bank, at Salina, and following said call, Lefferdink, or some of the clerks in the bank, prepared and had published a purported statement of the condition of the Kansas State Bank, at Salina. The original statement was delivered to the printer, and after publication the original was secured from the printer by Lefferdink and was never sent to the banking department. Subsequently a copy of the publication was secured and forwarded to the defendant's office. Such publication showed that the amounts of money on deposit to the credit of ·the Kansas State Bank was more than $50,000 larger than the amounts ·of money which said bank had on deposit in banks, and that the over-drafts as published were more than $50,000 less than such overdrafts

The State, *ex rel.*, v. Wilson.

were in fact. The defendant had nothing whatsoever to do with the preparation or publication of such statement other than issuing a call therefor to all banks in the state of Kansas. Following the discovery of the protested drafts the defendant requested Lefferdink's resignation as cashier. The defendant was never able to get a quorum of directors of the bank present to accept the resignation. Lefferdink, soon after request for his resignation was made and his activities in relation to these protested drafts were discovered, disappeared."

We are satisfied that the defendant was actuated by no corrupt motive in the course he pursued with reference to the Salina bank. There is no evidence whatever that he had any purpose to favor the unscrupulous speculators who wrecked it, at the expense of the depositors, or that he was actuated by any undisclosed selfish interest. He obviously believed that the closing of the bank would be so overwhelming a calamity that grave risks might justifiably be taken in order to avoid it— that considerations otherwise of great weight should be subordinated to the prevention of the breaking of the bank. The injury to the local business community that may follow from a bank failure is so serious that one who is charged with the responsibility of deciding at just what stage of financial embarrassment the struggle to pull a bank through its troubles and preserve it as a going concern should be abandoned is beset with a difficult and often complex problem, in attempting to solve which his judgment may naturally be warped by a delusive hope of success. The difficulty here is not to determine the good faith of the defendant's intentions, but to decide whether in the pursuit of the end he sought he so far transgressed the requirements of the statute as to render himself subject to ouster on that account.

The defendant by the terms of the statute was required to take charge of the bank (but not necessarily to close it) if he believed it to be insolvent. On this phase of the matter it is important to inquire whether he had that belief for any considerable period before the two occasions on which he did place a deputy in control. This must be determined in the light of matters as they appeared at the time, not as they have since developed. A bank is deemed insolvent under the statute "first, when the actual cash market value of its assets is insufficient to pay its liabilities; second, when it is unable to meet the demands of its creditors in the usual and customary man-

ner; third, when it shall fail to make good its reserve as required by law." (Gen. Stat. 1915, § 550.) Insolvency may result from a failure of a bank to restore its reserves for thirty days after being notified to do so. (Gen. Stat. 1915, § 529.). The first test is the only one important here. The bank did not fail to pay a demand in the usual course of business or to make good its reserve when required. •There was evidence that the reports of the bank examiners at different times were such as in the opinion of competent judges to show insolvency. This cannot conclude the defendant, however, because in the making and interpretation of these reports there is necessarily much room for the exercise of individual judgment. The examiner who took charge of the bank in December, 1918, testified that on February 18 following he did not know the bank to be insolvent. The defendant if he believed the bank to be solvent may have been unduly credulous, but the circumstances recited in the portion of the commissioner's report already quoted suggest that his optimism had some support in the apparent power of Broeker and Lefferdink to raise money. One witness, whose integrity is above suspicion and whose memory of what was said is doubtless more likely to be accurate than that of the defendant, testified that in June, 1920, the defendant in conversation with him returned an affirmative answer to the question whether on March 21, 1919, he knew the bank was insolvent. This evidence, of course, has an important bearing on the question, but apart from the possibility of a mutual misunderstanding as to just what was said the term insolvent may have been taken by the defendant in a general way as referring to a condition not accurately so described. It would extend the limits of this opinion too far to undertake to review in detail all the evidence bearing on this subject. We are not convinced that for any considerable period before he took possession of the bank the defendant believed it to be insolvent—a conclusion that is sufficient for the purpose of the particular matter now under consideration. We are also unable to regard it as proved that on the date last named—March 21, 1919—he knew the bank to be insolvent—a question having a bearing upon a proposition involved in a specification to be discussed later.

Nor do we think that the evidence proves that the defendant was guilty of willful misconduct in failing to take charge of the bank at other times than he did, because of the willful violation of the bank law by its officers. The resignation of the bank president and Broeker relieved him of any obligation to close the bank by reason of their wrongful acts. The taking over of the Broeker paper by the syndicate and the buying into the bank of Lefferdink seemed to have restored the bank to a sound condition. It is true that Lefferdink, even after the defendant had taken control of the bank following the purchase of the New Mexico ranch, was allowed extraordinary opportunities for juggling with its funds and credit. In the retrospect the forbearance and leniency shown Lefferdink seem difficult to reconcile with a reasonably diligent prosecution of the duties of the office of bank commissioner, but do not demonstrate a wrongful purpose on his part. The statute provides for the removal of a bank officer for misconduct by action of the directors on order of the commissioner. The order was made but not acted on. A more vigorous prosecution of the effort to get rid of Lefferdink would have developed a method of getting results, but the statute by penalizing the commissioner for allowing violations of the law to continue for more than ninety days (Gen. Stat. 1915, § 575) recognizes some latitude in the matter.

10. The eighth specification alleges that while the defendant knew the Salina bank to be insolvent he authorized and assisted in the issuance of its certificates of deposit for money borrowed, and permitted other state banks to purchase its certificates of deposit at less than their face value. With reference to this charge Commissioner Challis made this finding:

"During the incumbency of the defendant in office, George L. Kreeck, of Lawrence, Kan., connected with the Farmers State and Savings Bank at that point, purchased from Funnell, a former cashier and customer of such bank, $50,000 of certificates of deposit issued by the Salina State Bank. Kreeck advised the defendant that they were offered these certificates, and inquired of the defendant the standing thereof. The defendant advised him that the Salina bank was not in the best of shape and that they were seeking to put it in condition, and that these certificates were protected under the guaranty act. The defendant demanded that the Salina bank be given full credit for the $50,000, which was done. Nothing was said to the defendant by Kreeck as to any commission for the making of this deposit when Kreeck took the certificates

from Funnell. Funnell was advised that the full credit for the certificates must be given the Salina bank, and he must make his arrangements to get his credit from them. Subsequently, and without the knowledge or consent of the defendant, the Salina bank paid Funnell $3,500, presumably as his commission in securing this deposit. The defendant did not know that the Salina bank was insolvent at this time.

"About the middle of March, 1918, R. E. Crummer, of Brown-Crummer Company, a firm of bond brokers in Wichita, Kan., had negotiations with the Salina State Bank, through its officers, Lefferdink and Guilbert, for the making of a deposit of $50,000 in the Salina State Bank for the purpose of taking up a similar amount of outstanding matured certificates held by the Fourth National Bank of Kansas City [Wichita]. Crummer agreed with Lefferdink that if he could assure himself without any doubt, by investigation through the banking department, and that Lefferdink would assure him by arranging for sufficient cash deposits that the certificates would be paid when due, that they would consider making the deposit. Certificates were prepared for $50,000 and tendered to Crummer, which were declined. Subsequently negotiations were resumed, and the personal indorsement of Guilbert, the then president of the Salina State Bank, was demanded and received, and a $5,000 cash deposit. Telegrams and letters were exchanged between Brown-Crummer Company and the defendant relative to whether certificates were guaranteed under the guaranty act, and assurances were given by the defendant that certificates regularly issued were protected by the guaranty act and that the deposits received upon such certificates should go to the exclusive credit of the Salina State Bank. These certificates were received from Crummer by the American State Bank at Wichita, Kan., with the instructions to credit to Walter E. Wilson, trustee. The credit was so made. The deposit was made by Crummer personally, and he depended upon his ability to negotiate them with the American State Bank. The indorsement was without recourse. The $5,000 guaranty fund, which was made on the side by Lefferdink, was made without the knowledge or consent of the defendant, and has been retained by Crummer as a fee for his services. The $50,000 deposit in the American State Bank of Wichita was checked out by the defendant, as trustee, for the benefit of the Salina State Bank.

"During February, 1919, the defendant was advised by Broeker that one W. S. McClintock had taken certain certificates of deposit to Minneapolis, Minn., for delivery to a purchaser. The defendant was not advised of the details. Trafficking in certificates of deposit has been carried on by banks with the approval of the banking departments of many states. The defendant had some telegraphic communication with McClintock at Minneapolis and with others at that point who were interested in these certificates, and assurances were given by the defendant that certificates regularly issued were protected by the guaranty act and that full credit for such certificates should be given to the Salina State Bank. The defendant was advised that these certificates were to be delivered to a purchaser, but as soon as he learned that they were not de-

The State, *ex rel.*, v. Wilson.

livered as agreed on, he demanded that they be returned to the bank, which was accordingly done. In each instance in which the defendant was inquired of and gave assurances relative to status of certificates of deposit under the guaranty act he had no knowledge whátsoever of any commission being paid or discount suffered upon negotiations of such certificates, and no security was authorized or offered by the defendant on behalf of the Salina State Bank for the purpose of securing such deposits."

The statute expressly forbids a bank officer to accept deposits knowing the bank to be insolvent (Gen. Stat. 1915, §§ 532, 584), but no such express prohibition is laid upon the bank commissioner. If a bank commissioner is in fault for allowing a bank to receive deposits he is in fault for not closing it, for it cannot remain a going concern if deposits are refused. We have already held that knowledge of the insolvency of the bank on the part of the defendant has not been established. We approve the finding of Commissioner Challis acquitting the defendant of connivance at the issuance of certificates for less than their face value.

The ninth specification alleges that Lefferdink issued certificates of deposit to the amount of $125,000 for which the bank received no equivalent, and that the defendant, who learned of this shortly after, took no action to secure their return or to avoid their being charged against the assets of the bank, and knowingly permitted their use for the benefit of Lefferdink and his associates; and that with this knowledge of the defendant the certificates have gotten into the hands of persons claiming to be innocent purchasers.

The transaction referred to is that in relation to the New Mexico land, which is described in the portion of the report of Commissioner Challis already quoted in paragraph 9 of this opinion. There was evidence that the defendant gave instructions that the bank should not pay the certificates. We do not find that he knowingly permitted their use or that he was guilty of willful misconduct in relation to them.

The tenth specification alleges that the defendant assisted the officers in charge of the bank in securing loans to it or deposits in it for which he authorized the issuance of certificates of deposit, informing the persons making such loans or deposits that the certificates would be secured by the state guaranty fund and that such certificates were issued for money

borrowed by the bank. The defendant stated to prospective investors that certificates of deposit issued by the bank were a charge against the guaranty fund. He appears to have used diligent effort to prevent the issuance of certificates at a discount. Commissioner Challis interprets his statements as referring to certificates regularly issued. Even if he said that certificates which were not in fact protected by the guaranty law were so protected this would not necessarily be willful misconduct, the legal question being one upon which an honest difference of opinion might be entertained.

The eleventh specification alleges that the defendant permitted the persons in charge of the bank to issue certificates of deposit without payment or security and to sell them, and that some of them passed into the hands of persons claiming to be innocent holders. We find no willful misconduct proved against the defendant under this specification. The finding of Commissioner Challis with respect to it is as follows:

"In addition to the certificates which were issued to Kreeck and Crummer, there was an unauthorized issue by Lefferdink of $50,000 of certificates, which were handed to McClintock for delivery to a supposed purchaser in Minneapolis. Telegrams were exchanged by McClintock and the defendant and prospective purchasers in Minneapolis relative to these certificates. When the defendant ascertained that the certificates had not been regularly issued he ordered the certificates returned, which was accordingly done, and they never became a charge or liability against the bank."

The twelfth specification alleges that the officers of the bank caused drafts or acceptances to be drawn upon it by persons who did not have sufficient funds on deposit to pay such drafts, and that the drafts or acceptances were accepted or certified to be valid obligations of the bank, and were sold to various persons; and that the defendant on learning of such transactions shortly thereafter took no steps to recall the drafts or avoid their becoming valid charges against the bank.

On January 7, 1919, while the bank was in charge of the defendant's deputy, Lefferdink in Kansas City drew and accepted drafts of the character indicated and some of them were negotiated. Payment of these was refused by direction of the defendant, and litigation over them is pending. Commissioner Challis finds that the defendant had no knowledge of the transaction until more than a month afterwards. The

episode was an unfortunate consequence of the inefficient policy pursued toward Lefferdink, but as already indicated we do not find that the defendant's misconduct in this regard was occasioned by bad faith or wrongful motive.

The thirteenth specification alleges that the defendant permitted the delinquent officers of the bank and persons and companies in which they were interested to overdraw their accounts without security. The overdrafts were made but we do not find that this was with the knowledge or consent of the defendant.

The fourteenth specification alleges that the defendant permitted the officers of the bank to borrow money from it without adequate security and in excess of the legal limit. Such loans were made but not with the consent of the defendant.

The fifteenth specification alleges that the defendant permitted the bank to remain open and receive deposits while he knew it to be insolvent. This is covered by what has already been said. Commissioner Challis found in this connection:

"The defendant permitted the Salina State Bank to remain open for business and receive deposits while it may have been in fact an insolvent bank. The liability of the bank may have during the time it was open for business exceeded its assets in fact, and yet among the assets of the bank were the Broeker notes and the collateral for their security, the Guilbert and Lefferdink mortgages and the equity in the New Mexico ranch. If the New Mexico ranch financial scheme had gone through and the bonds been negotiated under arrangements the defendant had for the protection of the bank, the bank would not only have been solvent but in a highly prosperous condition. Under the peculiar circumstances existing and surrounding the bank, the markedly successful careers up to a certain point of the frenzied financiers in charge of its destinies, it is impossible for your commissioner to find, when in the exercise of the discretion reposed in him, the defendant should have taken steps to close this bank. It is now an established fact, as shown by the receivership and the shrinking in values brought about by the closing of the bank, that at the time it was closed it was insolvent. The bank did operate for a time when its reserve was below the legal requirements and this with the knowledge of the defendant, but the defendant's actions in permitting said bank to continue to operate were not willful in the legal sense of the term as understood by the commissioner."

11. The last count or specification, which was filed after the taking of the evidence, makes these allegations: Lefferdink as cashier caused drafts amounting to $50,000 on various banks in the East to be drawn and credited on the books of the Salina

bank to himself and Broeker. These drafts were credited to
the Salina bank by the Kansas City banks through which they
were sent for collection but were refused payment by the banks
on which they were drawn, the Kansas City banks deducting
the amount from the credit of the Salina bank on notice of this.
The drafts were returned to the Salina bank and Lefferdink
took possession of them and secreted or destroyed them. The
credit on the books of the Salina bank obtained in this way was
drawn upon and exhausted. No entries were made on the books
of the Salina bank showing that the drafts had been dishonored
and they continued to show the credit in favor of Lefferdink
and Broeker and that the bank had credit in Kansas City for
the drafts. In February, 1919, the deputy who had taken
charge of the bank about December 30, 1918, learned of this
transaction and informed the defendant thereof. The deputy,
acting under direction of the defendant, did not correct the
bank's books in this regard, and they remained in the condition
stated until the receiver was appointed, about May 26, 1919, the
entries carried from day to day showing the credits which did
not in fact exist. In March, 1919, a call was issued for state-
ments from state banks, and a statement of the Salina bank was
published in the Salina newspaper showing its credit with other
banks to be $50,000 larger than it actually was, by reason of
the transaction described. The defendant did not cause the re-
moval of Lefferdink as cashier and did not inform the county
attorney of Saline county of his wrongful acts until about the
time the receiver was appointed.

The finding of Commissioner Challis with respect to this
affair has already been set out in the last portion of the quota-
tions in paragraph 9. If the defendant's reason for not having
a correction made upon the bank's books was unsound the mis-
take was merely one of judgment. As stated in the finding re-
ferred to the defendant was not responsible for the false state-
ment that was published, the original of which was not sent to
his office; and while he did not notify the county attorney of
Lefferdink's wrongful acts he did inform the attorney-general's
office concerning them. The statute provides that it shall be
the duty of the bank commissioner to inform the county at-
torney of any county in which a bank is located of any violation
of the banking act which constitutes a misdemeanor or felony

by the officers of a bank.   (Gen. Stat. 1915, § 578.)   We regard the giving of the information to the attorney-general in person or through one of his assistants as a substantial compliance with this requirement.

Upon the grounds stated judgment is rendered for the defendant.