## SHIELDS v. STATE.

No. 29026. April 11, 1939.

A. F. Moss, H. R. Young, and William Blake, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Randell S. Cobb, Asst. Atty. Gen., Owen J. Watts, Asst. Atty. Gen., and Dixie Gilmer, County Atty., for defendant in error.

DANNER, J. On October 6, 1938, a grand jury in Tulsa county returned a written accusation against Eddie J. Shields, police commissioner of the city of Tulsa, wherein he was charged in four counts with being guilty of various acts and omissions constituting grounds for removal from office, and praying that he be removed.

In due time the defendant Shields filed his answer and the case came on for trial before an assigned judge, without a jury. At the conclusion of the state's evidence the court sustained the defendant's demurrer to three of the four counts, and overruled it as to the remaining count. The defendant then proceeded to put on his evidence in defense of that count. He was found guilty thereon, removed from office, and has appealed to this court.

The following is the count upon which defendant was found guilty:

"That said defendant, Eddie J. Shields, has been guilty of corruption in office, willful maladministration in office, and failure to produce and account for all public funds in his hands as required by law, in this, to wit:

"That on the 31st day of May, 1938, he received from the Coca-Cola Bottling Company of Tulsa, Oklahoma, $18.76; that on the 30th day of June, 1938, he received from the Coca-Cola Bottling Company of Tulsa, Oklahoma, $19.20; and on the 30th day of July, 1938, he received from the Coca-Cola Bottling Company of Tulsa, Oklahoma, $26.16; and that on the 31st day of August, 1938, he received from the Coca-Cola Bottling Company of Tulsa, Oklahoma, $29.28, which checks were for the operation of a Coca-Cola vending machine in the police station of the city of Tulsa, Oklahoma, and that said money so received was the property of and belonged to the city of Tulsa, a municipal corporation; that the said defendant willfully and wrongfully, unlawfully and intentionally, did convert and appropriate said sum of money to his own use, and to a use and purpose not in the due and lawful execution of his trust."

The said count charged that for the foregoing reasons defendant was guilty of (1) corruption in office; (2) willful maladministration in office; and (3) failure to produce and account for all public funds in his hands as required by law. Of those charges the trial judge found him guilty of the second only, that is, willful maladministration in office, and removed him on account thereof. The parties are virtually agreed that embezzlement was not committed, due to the fact that since defendant was not authorized by the city to receive the money from the Coca-Cola Company, that company's payment to him would not bar the city from recovering from the company in any case, and therefore the money never became the property of the city. We do not pass on that question. The trial judge did not find the defendant guilty of embezzlement. Our only inquiry is whether the facts are sufficient to constitute willful maladministration.

We do not at this time state the evidence in minute detail. The following is a brief general statement of the situation, which we shall later describe more particularly. Prior to the election of the defendant as police commissioner of the city of Tulsa, a peanut vending machine, a lunch stand, an automatic Coca-Cola vending machine, and another vending device were located within the police station. None of these devices or businesses was being conducted pursuant to any contract with the city of Tulsa. It appears that with the exception of the Coca-Cola vending machine the owners of the other businesses were not paying rental or royalty either to the city or any other person.

The Coca-Cola machine had originally been installed by the local Coca-Cola Company, at the instance of the Fraternal Order of Police. At the end of the first month of its operation the Coca-Cola Company had sent a check to the Fraternal Order of Police, based on a royalty of one cent per bottle of the Coca-Cola sold during that month. This check was returned by the fraternal order to the company with directions to make the check payable to the city of Tulsa. Thereafter said monthly royalty checks were made by the Coca-Cola company payable to the city of Tulsa and same were received by the city treasurer and deposited in the general fund.

Shortly after the defendant was elected to office he and his secretary and others held a conference which will later be described, and, pursuant thereto, when the first check arrived, defendant's secretary, at his direction, notified the Coca-Cola com-

pany that the checks should be made payable to a special police fund, which fund had not theretofore existed. The company was told that otherwise it would have to remove the machine. The company then made said monthly checks payable to the special police fund, and each and all of said four checks mentioned in the accusation, down to the date of this action, were deposited in a bank by the defendant in a special account which came to be known as the "Eddie J. Shields, Special Police Fund."

It is not contended that any dishonesty is involved, or that the defendant appropriated any of said fund to his own purely personal use, unless the following be so construed. The defendant, who is the only person who wrote checks on the account, on several occasions ordered and paid for flowers for sick policemen, for the funerals of deceased policemen, and purchased flowers for several sick persons who had no official connection with the police department. Also, one check was written for $4.65 reimbursing two policemen who had made a trip to another county to investigate the murder of the sheriff there. A check for $8 was made payable to a local newspaper or magazine called "The West Side Journal", which had solicited funds from said police department on this occasion. The florist always enclosed a card with the flowers indicating that they were sent by the police department, and the defendant was not mentioned. "The West Side Journal", however, in one issue, carried a space recognizing the contribution of the Tulsa Police Department, and this did contain the names of the chief of police, chief of detectives, the defendant, and his secretary.

Section 3447, O. S. 1931, 22 Okla. St. Ann. sec. 1181, reads:

"Any officer not subject to impeachment elected or appointed to any state, county, township, city, town, or other office under the laws of the state may, in the manner provided in this article, be removed from office for any of the following causes:

"First. Habitual or wilful neglect of duty.

"Second. Gross partiality in office.

"Third. Oppression in office.

"Fourth. Corruption in office.

"Fifth. Extortion or wilful overcharge of fees in office.

"Sixth. Wilful maladministration.

"Seventh. Habitual drunkenness,

"Eighth. Failure to produce and account for all public funds and property in his hands, at any settlement or inspection authorized or required by law."

As stated heretofore, the defendant was found guilty of the sixth subdivision only, willful maladministration. In appealing the contention of the defendant is that the word "willful," within the purview of the above statute, means more than the intentional or voluntary commission of an act, and means that the act must have been done with an evil intent or with a bad or corrupt motive. He further contends that the evidence is insufficient to establish, beyond a reasonable doubt, that he exercised an evil or bad intent in doing the things charged. The state contends that the word means simply an omission of duty or the committing of an act knowingly and willingly, and that it implies simply a purpose or intention to do the act; that said act need not be done with an evil or corrupt motive or purpose.

Therefore, the issues now under consideration are (1) the question concerning the correct construction of the words "willful" and "willful maladministration;" and (2) sufficiency or insufficiency of the evidence to sustain the judgment, under whatever constitutes the proper definition of those terms.

The state cites Bradford v. Territory ex rel. Woods, 2 Okla. 228, 37 P. 1061, as authority for its aforesaid contention, while the defendant cites Phillips v. State, 75 Okla. 46, 181 P. 713, as authority for his argument that the word "willful," as used in the statute, contemplates an evil or corrupt intent accompanying the acts depended upon as constituting grounds for ouster.

We find no conflict between those cases. The Bradford Case, decided by the territorial court under the same statute which we are now considering, affirmed a judgment of ouster removing the defendant from the office of county clerk. The law in force at that time made it the duty of the county clerk, after performance of certain conditions by the applicant, to issue a liquor license on payment by the applicant of a specified sum of money into the county treasury. The applicant was not entitled to a license until said payment had actually been made to the county treasurer, whereupon it became the duty of the county clerk to issue the license. The county clerk in that case issued liquor licenses to applicants without requiring them to make any payment to the county treasurer, and he accepted a sum himself from the applicants, less than the required fee, and he failed to pay said sum over to the treasurer. This probably was bribery, as

stated in the opinion, and the court rightly held that the defendant could not have committed that offense except knowingly and willfully.

The Phillips Case, supra, involved a situation where a county sheriff had (1) bet on an election, in violation of a statute making same a misdemeanor, and (2) had failed to arrest the person with whom he had bet. For those things the district court removed him from office under the first subdivision of the statute copied above, "habitual or willful neglect of duty." This court reversed the judgment. While condemning the conduct of the sheriff in betting on the result of an election, in violation of the statute, and condemning his failure to arrest the person with whom he had bet, the court held that in order for a neglect to be willful under the removal statute it was necessary that said neglect be shown to have been for a bad or evil purpose, and that under the particular circumstances of that case such had not been shown.

It was not intended by the Phillips decision to overrule the Bradford Case. The opinion in the Phillips Case expressly referred to and cited the Bradford Case as authority for the holding, as will hereinafter appear from quotation of the Phillips Case.

We believe the result of the Phillips Case is correct. Not every violation of statute or ordinance constitutes grounds for removal; else, for illustration, an officer driving his automobile in excess of a statutory speed limit, or perhaps ignorantly becoming guilty of some minor infraction of the law, would thereby subject himself to removal. Illustrations could be multiplied. The delinquency must be susceptible of affecting the duties of the office and there must be a bad intent. And so it was that in the Phillips Case this court reversed the judgment of ouster because of the absence of bad or evil purpose and intent, under the circumstances, although the defendant himself had violated the statute against betting and had also neglected his duty in not arresting the person with whom he bet. In the Bradford Case, however, it was held that willfulness was inherent in the offense for which the defendant was removed.

The state has cited section 1794, O. S. 1931, 21 Okla. St. Ann. sec. 92, reading:

"The term 'wilfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage."

We had the same section in our statutes when the Phillips Case was decided. The section immediately preceding (in Okla. St. Ann.) provides that:

"Wherever the terms mentioned in the following sections are employed in this chapter, they are deemed to be employed in the senses hereinafter affixed to them. * * *"

It would therefore appear that said definition of "willfully" was intended to apply to the sections of that chapter only, which chapter was devoted to certain crimes. (Chapter 23, Revised Laws of Oklahoma 1910.) We held in First National Bank of Healdton v. Dunlap, 122 Okla. 288, 254 P. 729, 52 A. L. R. 126, that the definitions prescribed in the above chapter (of which the definition of "willful" is one) are applicable solely to the chapter on crimes against property and are not applicable to civil proceedings. A proceeding to remove an officer is not a criminal proceeding; it is a civil action. Maben v. Rosser, 24 Okla. 588, 103 P. 674; Rutter v. Territory, 11 Okla. 454, 68 P. 507. Therefore, since the above definition of "willfully" applies only to criminal actions, and this is not a criminal proceeding, said definition is not applicable hereto. First National Bank v. Dunlap, supra.

The case of Phillips v. State, 75 Okla. 46, 181 P. 713, discussed above, appears to be the latest pronouncement of this court on the definition of "willful" as applied to the statute for removal of officers. The following terms of the second syllabus leave no doubt as to the rule in this jurisdiction:

"Under subdivision 1 of section 5692, providing for a removal of an officer from office for a 'habitual or willful neglect of duty,' held, a willful neglect of duty means that the act or failure to act was for a bad or evil purpose, or when the officer conscientiously acts or fails to act contrary to a known duty, he must be guilty of some conscious wrong or inexcusable carelessness or recklessness in the discharge or a failure to discharge an official duty. Mere thoughtless acts, with no bad or evil purpose, in which there is no inexcusable carelessness or recklessness on the part of an officer, will not justify a removal on the ground of habitual or willful neglect of duty."

We further said in that case:

"The only other question in this case left for the consideration of this court is the one presented by defendant in error

that it is a willful neglect of duty for a sheriff to bet on the result of an election and fail to report it. It is not every neglectful official act of an officer that will authorize his removal. The word 'willful' is not without meaning. Let us examine the authorities as to the meaning of 'willful,' as applied to an act of an officer. 22 Ruling Case Law, 281, in discussing the subject, states:

" 'An act is considered done willfully when it is done with a bad or evil purpose, or when the officer conscientiously acts contrary to a sworn duty; but conduct may be voluntary, thoughtless, or even reckless, without necessarily being willful.'

"Defining 'willfulness' in an action to remove an officer, the Iowa court used the following language:

" 'Every voluntary act of a human being is intentional; but, generally speaking, a voluntary act becomes willful in law only when it involves some degree of conscious wrong or evil purpose upon the part of the actor, or at least an inexcusable carelessness on his part, whether the act be right or wrong.' State v. Meek, 148 Iowa, 671, 127 N. W. 1023, 31 L. R. A. (N. S.) 566, Ann. Cas. 1912C, 1075.

"In Bradford v. Territory, 2 Okla. 228, 37 P. 1061, Chief Justice Burford held that where a county clerk issued a saloon license, collected less than the statutory fee, and kept it, he had willfully neglected his official duties. We are under the belief, from the authorities quoted, that willful neglect of an officer, authorizing his removal, means neglect in the relation to the duties of his office, willful in its character."

Since the meaning of the word "willful" should be the same in "willful maladministration" as it is in "willful neglect of duty," the correctness of the judgment in the instant case depends upon whether the evidence shows by a clear preponderance thereof (McCasland v. Board County Com'rs, 126 Okla. 103, 258 P. 750) that the defendant acted for a bad or evil purpose, whether he was guilty of a conscious wrong in the doing of the things which he did.

We may add that the definition of the word which is here adhered to is in accordance with the weight of authority. Felton & Stone v. United States, 96 U. S. 699, 24 L. Ed. 876, wherein it was said that the word, in the ordinary sense in which it is used in statutes, means not merely "voluntary", but with a bad purpose. Also see Spurr v. United States, 174 U. S. 728, 43 L. Ed. 1150; Williams v. People, 26 Colo. 272, 57 P. 701; Roby v. Newton, 121 Ga. 679, 49 S. E. 694, wherein it was

said that in a penal statute the word "willful" generally means with a bad purpose, an evil purpose, without ground for believing the act to be lawful. Mills v. Glennon. 2 Idaho, 105, 6 P. 116, 118, states:

"In law 'wilfully' has a well-defined signification. Bouvier says it has been decided that 'maliciously' is its equivalent. This term implies not merely voluntarily or intentionally, but 'legal malice;' an evil intent without 'justifiable excuse,' with 'a bad purpose,' 'corruptly'."

See, also, Huff v. Chicago L. & R. Co., 24 Ind. App. 492, 56 N. E. 932; State v. Meek, 148 Iowa, 671, 127 N. W. 1023; State v. Roth, 162 Iowa, 638, 144 N. W. 339, 50 L. R. A. (N. S.) 841; State v. Wilson, 108 Kan. 641, 196 P. 758. In State v. Hastings, 37 Neb. 96, 55 N. W. 774, the following was said:

"It may be safely asserted that where the act of official delinquency consists in the violation of some provision of the Constitution or statute which, if denounced as a crime or misdemeanor, or where it is a mere neglect of duty, willfully done, with a corrupt intention, or where the negligence is so gross, and the disregard of duty so flagrant, as to warrant the inference that it was willful and corrupt, it is within the definition of a misdemeanor in office. But where it consists of a mere error of judgment. or omission of duty, without the element of fraud, and where the negligence is attributable to a misconception of duty, rather than a willful disregard thereof, it is not impeachable, although it may be highly prejudicial to the interests of the state."

In State v. Wilson, supra, the Kansas court said:

"The statute is not designed for the removal of an officer merely for the improvement of the public service, because he has been inefficient and has acted with bad judgment. It is essentially penal in its nature and is to be construed accordingly. The word 'willful' is sometimes held to be equivalent to 'intentional' or 'designed,' and not to require a wrongful intention or malice, but generally, when employed in a penal statute, it indicates a bad or corrupt purpose, an evil intent without reasonable grounds to believe the action is lawful. 16 C. J. 80."

We therefore say that the rule of measurement by which the guilt or innocence of the defendant must be determined, requires that before defendant be legally pronounced guilty of willful maladministration in office the acts relied upon to sustain that charge must have been committed with a bad or evil intent or for a bad or evil purpose;

and that if said acts are merely thoughtless, or exhibit only an error of judgment, with no bad or evil purpose, they do not constitute willful maladministration in office.

We have saved a more detailed narrative of the evidence for this place, because we believe that the evidence on its own face demonstrates its insufficiency to sustain a reasonable inference of corrupt, evil or bad intent, without extended discussion or analysis by us for that purpose.

For about seven years prior to defendant's election to office there was a lunch stand, dispensing soft drinks, candy, cigars, coffee, and sandwiches in the basement of the City Hall, and the operator thereof never had a contract with the city of Tulsa or any person, and paid no rental to the city or anyone for the use of said space. The record does not reveal whether this lunch stand is the same establishment as the one in the police station. However, it is not disputed that a lunch stand had been operated in the police station for several years, without contract or payment of rental. It may be stated at this point that we do not emphasize the nonpayment of rental by others as excusing the errors of judgment committed by the defendant; we do believe, however, that they legitimately throw light on defendant's state of mind, and it is for that purpose only that we consider them. Similarly, the American Legion had operated a vending machine there, without charge, and was still doing so at the time of the trial. Still another vending machine was being operated without contract or rental, and no one knew who owned it. It was also shown that for many years the janitor had been in charge of renting the assembly hall to groups who would desire to use it for meetings at night, and that he was permitted to charge those groups about $3.00 and keep the money for himself; that the current used for the elevator and electric lights to accommodate said groups was the city's current. The city deducted a flat rate for electric service for these buildings, from the amount of current given the city by the public service company as a part of the franchise. This current was also connected to the Coca-Cola machine. Affairs of this nature were very loosely run; no regulations geared the enjoyment of business privileges in these buildings to any set plan of remuneration or regulation, and the entire affair appears to have been run on the free wheeling plan.

The defendant, the commissioner of finance, the mayor, and the other city authorities knew of this condition and apparently acquiesced therein. Private individuals had operated such businesses as the lunch stand and retained all the profits themselves, without payment to the city or any special fund of any department or person regulated or controlled by the city.

There was a plaque on an inside wall of the police station containing the names of police who had been killed in action. It was the custom to decorate this plaque with wreaths and flowers on Memorial Day. Shortly before Memorial Day the defendant, his secretary, and other officers were standing before the plaque, discussing what they would do about decorating it and raising money for the decoration. It was also mentioned that the members of the police force every week or so were required to donate for flowers for sick or deceased policemen or their relatives, or for some emergency charity demand. The defendant instructed his secretary, who had been a lawyer and a judge of the common pleas court of Tulsa county, to look into the possibility of creating a special fund for the aforesaid purposes, from rental to be derived from the Coca-Cola machine. Other than the peanut machine which was owned by the American Legion, they did not at that time know who owned the other devices. The secretary consulted with the assistant city attorney, and also with the city treasurer, and as a result thereof he directed the Coca-Cola company to make the checks payable to the special police fund. The record does not indicate what advice the assistant city attorney gave the secretary.

The police department conducted a stolen goods sale and a can of shoe polish was found after completion of the sale, and that shoe polish and an old shine stand which was given the police by a shoe repair shop, were used to set up a shoe shine stand in the police station. A negro trusty was placed in charge of the stand. He charged five cents per shine, deposited the five cents in each instance with the telephone girl and kept for himself what tips he received. The five cents from each shine was also deposited in this special police fund. There was no attempt at concealment; and the whole of the transactions were operated openly and aboveboard. The total amount collected was $99.81.

We now consider disbursements from the fund. There were less than ten disbursements, no one of them for an item in an amount greater than $10 and most of them less than $5, for a total of $55.49.

Flowers were sent to several sick police officers. Flowers were also sent to the funeral of Katherine McNulty. It was said that the McNultys had been friends of the city and the police department for many years, and the defendant, his secretary, and others thought that the sending of flowers to her funeral was a gesture in good order and in good faith; that the county judge did likewise and that the city hall was still taking collections to pay for the flowers which the employees there sent.

Emphasis is placed by the state on the fact that flowers were sent to the funeral of Ed Goodwin's mother. Ed Goodwin had no connection with the police department. He owned a tavern where beer was sold, and owned a Negro newspaper. Emphasis has also been placed upon the sending of flowers to a Mr. Gray, who owned certain licensed marble boards and slot machines, and had no official connection with the police department. Gray was sick in a hospital at the time. It was testified by the defendant's secretary, and nowhere disputed, that Gray and Goodwin had assisted the police department extensively in works of charity to indigent persons in emergencies. In that connection the following testimony from the secretary is found in the record:

"A. There isn't a day goes by in the police department but what we are called upon to perform acts of charity; charity that must be extended and extended promptly. When we first went into office there was many ways in which we discharged that duty. There were cases of charity which called for immediate relief and when such cases were brought to our attention we called upon Tom Gray for help and he very graciously responded; when such cases of charity came to the police department we called upon Tom Gray and he helped us out financially and otherwise and we thought there was nothing wrong in recognizing his serious situation when he was in the hospital by sending him some flowers in order to show our appreciation. Q. You say he helped you out financially, you mean when these emergencies came to the attention of your office you asked Mr. Gray to buy some groceries or to contribute money for that purpose? A. Yes, sir. Q. He didn't give any money to the police department? A. No sir. That kind of a case comes to our attention every day. Here is a case that occurred only yesterday. There is a man in jail charged with drunken driving and the officers were sent to his house to make an investigation. They found his family was starving and his wife said they had nothing in the house to eat. The officer bought this bill of goods shown here on this list, groceries and things and they will be reimbursed out of that fund."

The payment of $4.65 to Sid Jackson and Ike Wilson, police officers, for expense incurred by them in going outside the county and investigating the murder of the sheriff at Nowata, was made after it was learned that said officers could not be reimbursed out of any other fund.

The check heretofore mentioned which was paid to the West Side Journal, a weekly newspaper, and the act of sending it, could easily be criticised. It was testified that said newspaper had been one of the best friends the police department ever had, and that in it could always be found a record of the accomplishments and the police activities of the new police department; that a representative of the Journal solicited the $8 ad and it was given the paper as a gesture of appreciation and good will. Ten dollars was spent for membership in the Southwest Valleys Association at the request of the water commissioner of the city, who asked that the police contribute to said association, which sponsored a movement to make the Arkansas river navigable.

The question is whether the foregoing evidence is sufficient to show a bad or evil intent on the part of the defendant. We do not approve the acts of the defendant. When the Coca-Cola vending machine was installed and the first check sent to the Fraternal Order of Police, that organization returned the check and had payment made to the city. That action was correct and demonstrates the meticulous care that should characterize all handling of moneys that are, or might become, public funds. That is the only safe rule and guide for each and every officer in the handling of public funds, however small may be the amount involved. We mean no relaxation whatever of that rule, but we do hold that the evidence here is insufficient to warrant the removal of the defendant from office for willful maladministration, constituting an act of bad or evil intent or contrary to a known duty.

We do not agree with the trial judge that: "It is an irresistible conclusion that the fund was being used for the good will of the police commissioner himself". While the defendant may reasonably be suspected of not being averse to whatever political approval he may indirectly have received from the few trivial instances of "good will" achieved outside of the police department, as described above, those instances after all create nothing but suspicion. Probably no public official ever resented good

will resulting directly or indirectly from any of his acts, official or otherwise. So long as said acts do not amount to corruption, willful maladministration in office or the like as properly defined by the law, mere suspicion as to his motive which is thereby created cannot outweigh the presumption of innocence. Removal from office must rest on a more solid foundation.

The judgment is reversed and the cause is remanded, with directions to enter judgment for the defendant.

BAYLESS, C. J., WELCH, V. C. J., and RILEY, OSBORN, GIBSON, HURST, and DAVISON, JJ., concur. CORN, J., dissents.