2008 OK 21

**Dennis E. ESTES, Plaintiff,**

v.

**CONOCOPHILLIPS COMPANY,
Defendant.**

**No. 104,031.**

Supreme Court of Oklahoma.

March 4, 2008.

J. Vince Hightower, Broken Arrow, OK, for Plaintiff.

Steven A. Broussard, Robert P. Fitz–Patrick, Stephanie T. Gentry, Tulsa, OK, for Defendant.

KAUGER, J.

¶ 1 The United States District Court for the Northern District of Oklahoma certified two first impression questions of Oklahoma law:

1. Under the 2005 version of the Oklahoma Standards for Workplace Drug and Alcohol Testing Act, are evidential breath tests to determine an employee's blood alcohol content, laboratory services which must be confirmed by a licensed testing facility?

2. What is the standard to determine whether an employer has committed a willful violation of the Testing Act as the term in used in 40 O.S.2001 § 563(A)?

¶ 2 The plaintiff, Dennis E. Estes (Estes), a mechanical engineer, was employed by the defendant, ConocoPhillips Company (Conoco) for over thirty years. On the evening of May 23, 2005, his son came home from college, and Estes and his family celebrated with a family cookout, at which he drank beer and wine. On May 24, 2005, Estes arrived at work around 1:00 pm, and his supervisor asked him to submit to a drug and alcohol test, which, unbeknownst to Estes, had been scheduled several days prior, pursuant to Conoco's testing policy. There is no allegation that Estes appeared intoxicated, that he had ever been intoxicated at work, or that he had been anything but a model employee.

¶ 3 Estes was sent to Conoco's Ponca City Medical Clinic (the clinic), where a registered nurse utilized an "evidential breath testing device"[2] (EBT) to test Estes' blood alcohol content (BAC) at 1:30 pm. At the time of his test, it had been at least ten hours since Estes' last drink. The initial test results showed that Estes had a BAC of 0.076 gm/dl. At least fifteen minutes later, a second EBT indicated that Estes had a BAC of 0.064 gm/dl.[3] The maximum allowable BAC under Conoco's testing policy was 0.04 gm/dl, a level 50% lower than Oklahoma's legal limit for operating a motor vehicle under the influence of alcohol: 0.08 gm/dl.[4]

**2.** OAC 310:638–7–4(b)(2) defines evidential breath testing devices as those that comply with the National Highway Traffic Safety Administration's Model Specifications for Evidential Breath Testing Devices, 58 FR 48705–01 (1993), which provides: "EBTs measure the alcohol content of deep lung breath samples with sufficient accuracy for evidential purposes."

**3.** This is a variance of − 0.012 gm/dl. The Testing Act and the BOH Rules do not specify an acceptable variance between screening tests and confirmation tests. The Rules for the Board of Tests for Alcohol and Drug Influence permit a variance of ± 0.03 gm/dl. OAC 40:30–1–3(d) (2007).

Title 3 O.S. Supp.2004 §§ 301–308 govern drug and alcohol testing of operators of aircraft. Title 63 O.S. Supp.2003 § 4210.8 governs drug and alcohol testing of operators of vessels on state waters. Title 47 O.S. Supp.2006 §§ 751–761 regulate drug and alcohol testing of operators of motor vehicles on state roads, highways, and streets, and provide for the creation of the Board of Tests for Drug and Alcohol Influence. Title 47 O.S. Supp.2006 § 759 creates the Board of Tests for Alcohol and Drug Influence and authorizes the Board to set rules. The Rules of the Board of Tests for Alcohol and Drug Influence are found at Title 40 of the Oklahoma Administrative Code.

**4.** The legal limit for driving under the influence of alcohol in the State of Oklahoma is 0.08 gm/dl [47 O.S. Supp.2006 § 11–902(A)(1)]. The legal limit is 0.10 gm/dl for operators of vessels on state waters [63 O.S. Supp.2003 § 4210.8(A)(1)] and 0.04 gm/dl for operators of aircraft [3 O.S. 2001 § 301(A)(1)].

¶ 4 When a police officer subjects an operator of a motor vehicle to an EBT, Oklahoma law mandates that a sufficient quantity of breath must be obtained and retained for 60 days so that the person may have an independent laboratory conduct a test on the sample preserved.[5] However, the Testing Act does not require employers to use an EBT that retains a breath sample for retesting.[6] The clinic used the Intoximeter Alcosensor IV, the least expensive EBT included in the BOH Rules' table of approved EBTs.[7] The Intoximeter Alcosensor IV is a handheld device powered by a nine volt battery that is of the "blow through" variety, therefore, no sample of Estes' breath was collected which could be independently tested at a later date, and no sample of any bodily fluid was taken or preserved. Based solely on the EBT results and no other evidence, Conoco termi-nated Estes within an hour of the administration of the second EBT, and informed him that there was no procedure to appeal his dismissal. It is undisputed that, at the time, the clinic did not have a license to perform laboratory services under the Testing Act.[8]

¶ 5 On August 4, 2005, Estes filed a wrongful termination suit in the United States District Court for the Northern District of Oklahoma alleging that his employment was terminated in willful violation of the Testing Act. He sought injunctive relief to prevent Conoco from engaging in future testing and declaratory relief to reinstate him to his previous position. He also sought monetary damages including lost wages, compensatory damages for emotional distress and damage to his reputation, as well as attorney's fees, costs, and expenses. On

5. Title 47 O.S. Supp.2006 § 752(F) provides:
 When a test of breath is performed for the purpose of determining the alcohol concentration thereof, except when such test is performed by means of an automated analyzer as designated by the Board, a sufficient quantity of breath, or of the alcohol content of a fixed or measured quantity of breath, shall be obtained, in accordance with the rules and regulations of the Board, to enable the tested person, at his or her own option and expense, to have an independent analysis made of such specimen. The excess specimen of breath, or of its alcohol content, shall be retained by the law enforcement agency employing the arresting officer, in accordance with the rules and regulations of the Board, for sixty (60) days from the date of collection. At any time within that period, the tested person, or his or her attorney, may direct that such specimen be sent or delivered to a laboratory of his or her own choosing and approved by the Board for an independent analysis. Neither the tested person, nor any agent of such person, shall have access to the additional specimen of breath, or of its alcohol content, prior to the completion of the independent analysis thereof, except the analyst performing the independent analysis and agents of the analyst.
 See Bryant v. Commissioner of Dept. of Pub. Safety, 1996 OK 134, ¶ 7, 937 P.2d 496.

6. OAC 310:638–7–6(b) provides:
 Devices for breath alcohol confirmation tests. For confirmation tests, alcohol testing facilities shall use EBTs that meet the following requirements:
 (1) EBTs shall have the capability of providing, independently or by direct link to a separate printer, a printed result of each breath test;
 (2) EBTs shall be capable of assigning a unique and sequential number to each completed test, with the number capable of being read by the BAT and the employee before each test and being printed out along with the test result.
 (3) EBTs shall be capable of printing out the manufacturer's name for the device, the device's serial number, and the time of the test.
 (4) EBTs shall be able to distinguish alcohol from acetone at the 0.02 alcohol concentration level.
 (5) EBTs shall be capable of testing an air blank prior to each collection of breath; and
 (6) EBTs shall be capable of performing an external calibration check.

7. OAC 310:638–7–4(b)(2) provides that all approved EBT devices must be included on the National Highway Traffic Safety Administration's Model Specifications for Devices to Measure Breath Alcohol Conforming Products List, 59 FR 18839–02 (1994). The Intoximeter Alcosensor IV is included in the table.

8. The clinic has since applied for a license. Deposition of Dr. Brian Meek, M.D., taken July 11, 2006, provides in pertinent part:

 Q Are you aware of when ConocoPhillips for its Ponca City facility first sought a license from the State Board of Health to do alcohol testing?
 A Within the last, well, subsequent to Mr. Estes' test, okay, that license was sought.
 Q Was it as a result of Mr. Estes' lawsuit?
 A As far as I am aware, most likely.
 Q I'm not used to candid answers. Thank you, sir.

August 25, 2005, Conoco moved to dismiss Estes' complaint for failure to state a cause of action under the Testing Act. On November 7, 2006, the federal court certified the questions to this Court.

## I.

¶6 **EVIDENTIAL BREATH TESTS ARE LABORATORY SERVICES WHICH MUST BE CONFIRMED BY A LICENSED TESTING FACILITY BEFORE AN EMPLOYER MAY TAKE DISCIPLINARY ACTION IN RELIANCE ON THOSE TEST RESULTS.**

¶7 The Oklahoma Standards for Workplace Drug and Alcohol Testing Act (the Testing Act/the Act), 40 O.S. §§ 551–565, was enacted in 1993 to govern employers who test job applicants or employees for drugs or alcohol.[9] The Testing Act enabled the Oklahoma State Board of Health (Board of Health) to promulgate rules for the licensure and regulation of testing facilities, and for the establishment of minimum testing standards and procedures.[10] In 1994, the Board of Health enacted the Drug and Alcohol Testing Rules (BOH Rules), OAC 310:638.

¶8 The Testing Act sets out the requirements for licensure at 40 O.S.2001 § 558. It provides that no testing facility may provide laboratory services to an employer to test for the presence or absence of drugs or alcohol unless it meets the qualifications for testing facilities set by the Testing Act and the BOH Rules.[11] The Act defines the term "testing facility" as any clinic or facility which provides laboratory services to test for the presence of drugs or alcohol.[12] The term labora-

9. Title 40 O.S.2001 § 553 provides:

> A. The Standards for Workplace Drug and Alcohol Testing Act shall not be construed as requiring or encouraging employers to conduct drug or alcohol testing.
> B. Except as provided in subsection C of this section, employers who choose to conduct drug or alcohol testing of job applicants or persons employed in this state shall be governed by the provisions of this act and the rules promulgated pursuant thereto.
> C. Drug or alcohol testing required by and conducted pursuant to federal law or regulation shall be exempt from the provisions of the Standards for Workplace Drug and Alcohol Testing Act and the rules promulgated pursuant thereto.
> D. This act shall not be construed as preventing the negotiation of collective bargaining agreements that provide greater protection to employees or applicants than is provided by this act.

10. Title 40 O.S.2001 § 557(A) provides in pertinent part:

> The State Board of Health shall implement and enforce the provisions of the Standards for Workplace Drug and Alcohol Testing Act. The Board shall have the power and duty to promulgate, prescribe, amend and repeal rules for the licensure and regulation of testing facilities and for the establishment and regulation of minimum testing standards and procedures. . . .

11. Title 40 O.S.2001 § 558 provides:

> A. On and after July 1, 1994, no testing facility shall provide laboratory services to an employer to test for the presence or absence of drugs or alcohol unless it meets the qualifications established for testing facilities pursuant to Section 7 of this act and is licensed by the State Department of Health to perform such tests. The State Board of Health shall promulgate rules relating to the issuance of such license, including rules governing license revocation, suspension, and nonrenewal.
> B. The fees for licensure of testing facilities by the State Department of Health shall be set by the State Board of Health and shall not be more than One Hundred Fifty Dollars ($150.00) annually.
> C. Any testing facility providing laboratory services to an employer to test for the evidence of drugs and alcohol which is not licensed by the State Department of Health pursuant to this section shall be subject to an administrative fine of not more than Five Hundred Dollars ($500.00) for each offense. Each test performed by the unlicensed testing facility in violation of this section shall constitute a separate offense.

12. Title 40 O.S.2001 § 552(15) provides:

> "Testing facility" means any person, including any laboratory, hospital, clinic or facility, either off or on the premises of the employer, which provides laboratory services to test for the presence of drugs or alcohol in the human body. The administration of on-site drug screening tests to applicants or employees to screen out negative test results are not laboratory services under this paragraph, provided the on-site tests used are cleared by the federal Food and Drug Administration for commercial marketing, and all positive results of such tests are confirmed by a testing facility in accordance with Standards for Workplace Drug and Alcohol Testing Act.

The definition of "testing facility" has since been amended to exclude screening tests for alcohol cleared by the National Highway Traffic Safety

tory services is not defined either in the Testing Act or the BOH Rules. It is undisputed that the clinic was not licensed under the Testing Act at the time it administered the EBT, and Estes contends that because of this, Conoco was not entitled to terminate him based on the results of the EBT confirmation test performed at the clinic. Conoco counters that EBT are not laboratory services as contemplated by the Testing Act, and therefore do not require licensure.

¶ 9 The Testing Act requires that two tests be performed when an employer uses an EBT to test employees for alcohol, the first is called a screening test and the second is called a confirmation test.[13] The BOH Rules repeatedly address confirmation tests for alcohol conducted using an EBT. BOH Rule 310:638-1-4(b)(2) provides, "Confirmation tests. Breath or blood shall be used for the confirmation test for alcohol." Rule 310:638-7-5 provides in pertinent part: "All positive initial alcohol screening tests shall be confirmed using breath analyzed by an EBT or

blood analyzed by gas chromatography."[14] Furthermore, alcohol confirmation tests conducted using an EBT are heavily regulated by BOH rules. BOH Rule 310:638-7-6 is entitled "Breath Alcohol Confirmation Tests," and contains two and a half pages of detailed regulations for conducting alcohol confirmation tests using an EBT.[15] Throughout this rule, the acronym "EBT" is used *forty-four* times. In depositions, both Board of Health General Counsel Gary Gardenhire and Board of Health Director of Facility Services Dean Bay testified that the Board of Health has historically considered EBT to be a laboratory service requiring licensure.[16]

¶ 10 Pursuant to the Administrative Procedures Act, 75 O.S.2001 §§ 250-323, the Legislature may delegate rulemaking authority to agencies, boards, and commissions to facilitate the administration of legislative policy.[17] Administrative rules are valid expressions of lawmaking powers having the force and effect of law.[18] Administrative rules,

---

Administration from the definition of laboratory services. 40 O.S. Supp.2005 § 552(15). An EBT is one such alcohol testing device. OAC 310:638-7-4(b)(2). OAC 310:638-1-2 provides: "Alcohol testing facility" means any building, place, or facility in which operations, procedures, or examinations of materials derived from the human body are performed for the purpose of alcohol testing, and if, as a result of such testing, mandatory or discretionary consequences may be rendered to the individual.

13. See 40 O.S.2001 §§ 552(4), 562(A); *McClure v. ConocoPhillips Co.*, 2006 OK 42, ¶¶ 10-11, 142 P.3d 390.

14. We recently held in *McClure v. ConocoPhillips Co.*, see note 13, supra at ¶ 1, that confirmation tests for alcohol could be performed using the same EBT that was used to perform the screening test.

15. OAC 310:638-7-6 includes sections on: 1) qualifications of breath alcohol technicians; 2) acceptable devices for breath alcohol confirmation tests; 3) quality assurance plans for EBTs; 4) procedures for chain of custody; 5) procedures for confirmation tests using EBTs; 6) procedures for refused and uncompleted tests; 7) procedures for a subject's inability to provide an adequate amount of breath; and 8) definitions of invalid tests.

16. Deposition of Gary Gardenhire, September 26, 2005 provides in pertinent part:

Q. . . . [I]t has been the State Board of Health's historical interpretation and enforcement of the alcohol testing statute that it does cover alcohol testing using an EBT, or an evidential breath testing device?
A. The answer, yes.
Deposition of Dean Bay, October 5, 2005 provides in pertinent part:
Q. All right. So, no matter how an employer chooses to test for alcohol, whether he uses an EBT, blood, saliva, or urine, they are required to seek and obtain a license from the Oklahoma State Board of Health; correct?
A. That is correct.

17. Title 75 O.S.2001 § 250.2(B) provides in pertinent part:

In creating agencies and designating their functions and purposes, the Legislature may delegate rulemaking authority to these agencies to facilitate administration of legislative policy. The delegation of rulemaking authority is intended to eliminate the necessity of establishing every administrative aspect of general public policy by legislation. . . .
See *McClure v. ConocoPhillips Co.*, see note 13, supra at ¶ 17.

18. Title 75 O.S.2001 § 308.2(C) provides:

Rules shall be valid and binding on persons they affect, and shall have the force of law unless amended or revised or unless a court of competent jurisdiction determines otherwise. Except as otherwise provided by law, rules shall be prima facie evidence of the proper

like statutes, are to be given a sensible construction.[19]

■ ¶ 11 Statutory construction by agencies charged with the law's enforcement is given persuasive effect especially when it is made shortly after the statute's enactment.[20] Nevertheless, if the Legislature disagrees with an agency interpretation, it may: 1) delay, suspend, veto, or amend any rule or proposed rule by joint resolution; 2) disapprove a permanent or emergency rule at any time if it determines the rule to be inconsistent with legislative intent; or 3) make emergency rules ineffective through its disapproval.[21] None of these actions have been taken by the Legislature in regard to the BOH rules. The Legislature's silence is evidence of the lawmakers' consent and adoption of the administrative construction.[22]

■ ¶ 12 This Court will show great deference to an agency's interpretation of its own rules.[23] When the terms of a regulation are amenable to more than one meaning, we ordinarily defer to the interpretation adopted by those charged with the duty of administration.[24] When choosing between two or more possible meanings of a regulation, controlling weight may be given to long-continued administrative usage unless it is plainly erroneous or inconsistent with the language.[25] Deference to an agency's interpretation is even more clearly in order when the construction is that of an administrative regulation rather than a statute.[26]

■ ¶ 13 It is clear that the Board of Health has interpreted alcohol confirmation tests utilizing EBT as laboratory services requiring licensure, and that the Legislature has adopted this construction. Therefore, we find that under the version of the Testing Act in effect on May 24, 2005, evidential breath tests to determine an employee's blood alcohol level are laboratory services which must be confirmed by a licensed testing facility before an employer may take disciplinary action in reliance on those test results.

## II.

¶ 14 **THE TERM WILLFUL VIOLATION AS FOUND IN 40 O.S.2001 § 563(A)**

interpretation of the matter to which they refer.
*See McClure v. ConocoPhillips Co.*, see note 13, supra at ¶ 17.

19. *McClure v. ConocoPhillips Co.*, see note 13, supra at ¶ 17; *Walker v. Group Health Serv., Inc.*, 2001 OK 2, ¶ 27, 37 P.3d 749; *Oklahoma Alcoholic Beverage Control Bd. v. Burris*, 1980 OK 58, ¶ 13, 626 P.2d 1316.

20. *McClure v. ConocoPhillips Co.*, see note 13, supra at ¶ 19; *Walker v. Group Health Serv., Inc.*, see note 19, supra; *Schulte Oil Co., Inc. v. Oklahoma Tax Comm'n*, 1994 OK 103, ¶ 4, 882 P.2d 65. The BOH Rules were promulgated in the year after the Testing Act was enacted.

21. Title 75 O.S.2001 § 250.2(B)(4–6) provides in pertinent part:
... [T]he Legislature reserves to itself:
4. The right to approve, delay, suspend, veto, or amend the implementation of any rule or proposed rule while under review by the Legislature by joint resolution.
5. The right to disapprove a proposed rule or amendment to a rule during the legislative review period independent of any action by the Governor by a concurrent resolution.
6. The right to disapprove a permanent or emergency rule at any time if the Legislature determines such rule to be an imminent harm to the health, safety or welfare of the public or the state or if the Legislature determines that a rule is not consistent with legislative intent. Title 75 O.S.2001 § 253(H)(2)(a) provides:
Any promulgated emergency rule shall be made ineffective if disapproved by the Legislature.
*See McClure v. ConocoPhillips Co.*, see note 13, supra at ¶ 19.

22. *McClure v. ConocoPhillips Co.*, see note 13, supra at ¶ 19; *Walker v. Group Health Serv., Inc.*, see note 19, supra; *Branch Trucking Co. v. State ex rel. Okla. Tax Comm'n*, 1990 OK 41, ¶ 6, 801 P.2d 686.

23. *Application of Southwestern Bell*, 2007 OK 55, ¶ 23, 164 P.3d 150; *Bell v. Phillips Petroleum Co.*, 1982 OK 28, ¶ 24, 641 P.2d 1115; *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

24. *Application of Southwestern Bell*, see note 23, supra; *Commonwealth Edison Co. v. U.S. Dept. of Energy*, 877 F.2d 1042, 1045–1046 (D.C.Cir. 1989).

25. *Application of Southwestern Bell*, see note 23, supra; *Bell v. Phillips Petroleum Co.*, see note 23, supra.

26. *Application of Southwestern Bell*, see note 23, supra; *Bell v. Phillips Petroleum Co.*, see note 23, supra; *National Ass'n of Home Builders v. De-*

MEANS CONSCIOUS, PURPOSEFUL VI-OLATIONS OF THE TESTING ACT OR DELIBERATE DISREGARD OF THE TESTING ACT BY THOSE WHO KNOW OR SHOULD HAVE KNOWN OF ITS PROVISIONS.

¶ 15 Neither the Testing Act nor the BOH Rules define the term willful. Conoco argues that the term means that a violator had some knowledge or understanding that it is committing an act prohibited by the Testing Act. Estes argues that the term means that a violator knew or should have known its actions were in violation of the Testing Act. Title 40 O.S.2001 § 563(A) provides:

Any person aggrieved by a *willful violation* of the Standards for Workplace Drug and Alcohol Testing Act may institute a civil action in a court of competent jurisdiction within two (2) years of the person's discovery of the alleged *willful violation* or of the exhaustion of any internal administrative remedies available to the person, or be barred from obtaining the relief provided for in subsection B of this section. [Emphasis added.]

 ¶ 16 The primary goal of statutory interpretation is to ascertain and follow the intent of the Legislature.[27] Where a statute's meaning is ambiguous or unclear, we employ rules of statutory construction to give the statute a reasonable construction that will avoid absurd consequences.[28] It is important in construing the Legislative intent behind a word to consider the whole act in light of its general purpose and objective, considering relevant portions together to give full force and effect to each.[29] A statute will be given a construction, if possible, which renders every word operative, rather than one which makes some words idle and meaningless.[30] We presume that the Legislature expressed its intent and intended what it expressed, and statutes are interpreted to attain that purpose and end, championing the broad public policy purposes underlying them.[31]

¶ 17 The term willful does not have a uniform meaning throughout our statutes. As the Court stated in *Wick v. Gunn*, 1917 OK 607, ¶ 3, 169 P. 1087, there are "numerous definitions of the word [willful] by both lexicographers and jurists." In the context of a willful violation of the Alcoholic Beverage Control Act, this Court held: "The word 'willfully' is of similar import or the equivalent of 'knowingly' [and] requires that the licensee at least have some knowledge of the commission of the prohibited acts."[32] The Court held that a willful violation of the Open Meetings Act, "does not require a showing of bad faith, malice, or wantonness, but rather, encompasses both conscious, purposeful violations of the law and blatant or deliberate disregard of the law by those who know, or should know, the requirements of the [Open Meetings] Act."[33]

¶ 18 When used to determine whether a Workers' Compensation claimant willfully fails to use safety equipment, this Court held that the term signifies "more than a mere act of the will, and carries with it the idea of premeditation, obstinacy, and intentional

*fenders of Wildlife*, — U.S. —, —, 127 S.Ct. 2518, 2534, 168 L.Ed.2d 467 (2007).

27. *King v. King*, 2005 OK 4, ¶ 22, 107 P.3d 570; *TRW/Reda Pump v. Brewington*, 1992 OK 31, ¶ 5, 829 P.2d 15; *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Comm'n*, 1988 OK 117, ¶ 7, 764 P.2d 172; *Hess v. Excise Bd. of McCurtain County*, 1985 OK 28, ¶ 6, 698 P.2d 930.

28. *Dean v. Multiple Injury Trust Fund*, 2006 OK 78, ¶ 9, 145 P.3d 1097; *Head v. McCracken*, 2004 OK 84, ¶ 16, 102 P.3d 670; *TRW/Reda Pump v. Brewington*, see note 27, supra.

29. *Saul v. Alcorn*, 2007 OK 90, ¶ 19 fn. 31, 176 P.3d 346; *King v. King*, see note 27, supra; *Simpson v. Oklahoma Alcoholic Beverage Control Bd.*, 1965 OK 206, ¶ 18, 409 P.2d 364; *Oklahoma*

*Natural Gas Co. v. Corporation Comm'n of Okla.*, 1923 OK 400, ¶ 0, 216 P. 917.

30. *State ex rel. Thompson v. Ekberg*, 1980 OK 91, ¶ 7, 613 P.2d 466; *Integrity Mut. Cas. Co. v. Garrett*, 1924 OK 721, ¶ 11, 229 P. 282; *Matthews v. Rucker*, 1918 OK 29, ¶ 5, 170 P. 492.

31. *McClure v. ConocoPhillips, Co.*, see note 13, supra at ¶ 12; *King v. King*, see note 27, supra; *Cox v. State ex rel. Okla. Dept. of Human Services*, 2004 OK 17, ¶ 19, 87 P.3d 607.

32. *Oklahoma Alcoholic Beverage Control Bd. v. Milam*, 1964 OK 54, ¶ 13, 393 P.2d 823.

33. *Rogers v. Excise Bd. of Greer County*, 1984 OK 95, ¶ 14, 701 P.2d 754; *In re Order Declaring Annexation*, 1981 OK CIV APP 57, ¶ 29, 637 P.2d 1270.

wrongdoing."[34] Willful neglect of a teacher's duties is defined as "a knowingly and purposeful violation of a teacher's duties."[35] Construing willful maladministration by a public officer, the Court held:

> Every voluntary act of a human being is intentional; but, generally speaking, a voluntary act becomes willful in law only when it involves some degree of conscious wrong or evil purpose upon the part of the actor, or at least an inexcusable carelessness on his part, whether the act be right or wrong.[36]

Because the term willful does not have a singular meaning, it must be construed within the confines of the Act in which it appears.

¶ 19 This Court has addressed the Testing Act in only one prior case: *McClure v. ConocoPhillips Co.*, 2006 OK 42, 142 P.3d 390. As here, we answered a certified question from the United States District Court for the Northern District of Oklahoma. There, we answered that an employer did not violate the Testing Act by using the same EBT to perform a screening test and a confirmation test. Because we did not find a violation of the Testing Act in *McClure*, we did not reach the question of what constituted a willful violation of the Testing Act.

 ¶ 20 Because the term willful is undefined by the Testing Act and the BOH Rules, we must determine the legislative intent behind the term by looking to the general purpose and objective of the Testing Act. The Testing Act states that it is not intended to require or encourage employers to conduct drug or alcohol testing of employees, but that employers who do choose to conduct such tests are to be governed by both the Testing Act and the BOH Rules.[37] The purpose behind the Testing Act is to create standards for employer drug and alcohol testing so both employees and employers can be assured of due process. Were we to adopt the standard for willful violations urged by Conoco, we would remove any possibility of a civil remedy for an employee in all but the most extreme violations. If an employer could establish ignorance of the Testing Act, the employee would be left without a remedy, thus largely thwarting the Legislature's intent to regulate workplace drug and alcohol testing.

¶ 21 Additionally, the meaning of the term willful as found in the Testing Act may be understood by comparing the civil remedies laid out in § 563(A), with the criminal penalties contained at 40 O.S.2001 § 565, which provides:

> Any person who *willfully and knowingly* violates the provisions of the Standards for Workplace Drug and Alcohol Testing Act shall be guilty of a misdemeanor and, upon conviction, punishable by a fine of not less than One Hundred Dollars ($100.00) nor more than Five Thousand Dollars ($5,000.00) or imprisonment in the county jail for not more than one (1) year, or by both such fine and imprisonment. [Emphasis added.]

If we were to treat the term willful as synonymous with the term knowing, we would thereby render either § 563 or § 565 meaningless, by construing the standards for obtaining civil and criminal remedies identically. This sort of interpretation would work an absurdity, at odds with the purpose of the Testing Act.

 ¶ 22 It is axiomatic, that in most instances, ignorance of the law is no excuse, and every person is presumed to know the law.[38] Therefore, we find that the term will-

---

**34.** *Wise–Buchanan Coal Co. v. Ray*, 1932 OK 424, ¶ 0, 17 P.2d 360; *Gregory v. Oklahoma Operating Co.*, 1929 OK 477, ¶ 0, 282 P. 139; *Wick v. Gunn*, 1917 OK 607, ¶ 0, 169 P. 1087.

**35.** *Childers v. Independent Sch. Dist. No. 1 of Bryan County*, 1981 OK 123, ¶ 19, 645 P.2d 992.

**36.** *Shields v. State*, 1939 OK 203, ¶ 21, 89 P.2d 756.

**37.** Title 40 O.S.2001 § 553(A–B), see note 9, supra.

**38.** *Bullard's Oil Field Serv. Inc. v. Williford Energy Co.*, 1989 OK 63, ¶ 8, 775 P.2d 802 [a corporation may not unduly benefit from its avowed ignorance of Oklahoma law]; *Nottingham v. City of Yukon*, 1988 OK 130, ¶ 11, 766 P.2d 973 [everyone is presumed to know the law]; *Halstead v. McHendry*, 1977 OK 131, ¶ 12, 566 P.2d 134 [everyone is presumed to know the law]; *American Perforating Co. v. Oklahoma State Bank*, 1970 OK 4, ¶ 22, 463 P.2d 958 [every person is presumed to know the law]; *Fourth Nat. Bank of Tulsa v. Board of Comm'rs of Craig County*, 1939 OK 320, ¶ 0, 95 P.2d 878 [all per-

ful violation as found in 40 O.S.2001 § 563(A) contemplates not only conscious, purposeful violations of the Testing Act, but also deliberate disregard of the law by those who know, or should have known, of the requirements of the Testing Act.

## CONCLUSION

¶ 23 Drug and alcohol testing is not only addressed by the Testing Act and BOH Rules, but also by extensive statutes and administrative rules governing drug and alcohol testing performed or directed by law enforcement officers.[39] The Rules for the Board of Tests for Drug and Alcohol Influence contain detailed requirements for EBT, the purpose of which are to provide:

> ... scientific and procedural safeguards to assure the validity and reliability of such tests, designate methods and procedures for breath-alcohol analysis approved by the Board, and prescribe and control other aspects of such tests.[40]

The Legislature has so extensively regulated EBT and other methods of drug and alcohol testing precisely because the outcomes of these tests carry such weighty consequences, from serious criminal penalties to the often just as serious consequence of termination of employment.[41] Given the high stakes, it is clear that the Legislature seeks to control and regulate drug and alcohol testing, whether by law enforcement officials or employers. The means by which the state may determine whether an employer is adhering to the Testing Act and the BOH Rules is the ongoing requirement of licensure. Were we to adopt Conoco's interpretation, employers would need a license to test employees' blood, saliva, hair, or urine for drugs or alcohol, but would not need a license to test breath, thus preventing the State from regulating perhaps the most common method employed to test for alcohol. Such an interpretation would frustrate the purpose of the Testing Act— ensuring due process in workplace drug and alcohol testing by regulating the practice.

¶ 24 One remedy created by the Testing Act is civil liability for employers who have subjected an employee to an adverse employment decision based on a violation of the Testing Act or BOH Rules. The standard for willful violations of the Testing Act includes purposeful violations as well as violations done in deliberate disregard of the Act by those who knew, or should have known, of its provisions. To adopt any other construction would be to transform both the Testing Act and the BOH Rules into no more than detailed suggestions for workplace drug and alcohol testing that employers could make powerless by simply disregarding them.

¶ 25 The crux of the matter is that evidential breath tests are laboratory services which must be confirmed by a licensed testing facility before an employer may take disciplinary action against an employee. The term willful violation means conscious, purposeful violations or deliberate disregard of the Testing Act by those who know or should have known of its provisions.

**QUESTIONS ANSWERED.**

EDMONDSON, V.C.J., HARGRAVE, OPALA, KAUGER, WATT, TAYLOR, COLBERT, and REIF, JJ., concur.

WINCHESTER, C.J., not participating.

---

sons are presumed to know the law]; *Town of Red Fork v. Gantt–Baker Co.*, 1928 OK 149, ¶ 0, 266 P. 444 [all are presumed to know the law]; *Colbert v. First Nat. Bank of Ardmore*, 1913 OK 445, ¶ 2, 133 P. 206 [every person is presumed to know the law].

**39.** See note 3, supra.

**40.** OAC 40:30–1–1.

**41.** *See Chan v. City of Chicago*, 916 F.Supp. 804, 806 (N.D.Ill.1996) [loss of employment is a serious economic consequence]; *Holien v. Sears Roebuck & Co.*, 298 Or. 76, 689 P.2d 1292, 1303 (1984) [wrongful termination can result not only in monetary loss, but in anguish, physical symptoms of stress, and a sense of degradation].